2022 IL App (1st) 211055

No. 1-21-1055

Opinion filed July 27, 2022

Third Division

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| KATHLEEN RICHARDSON, | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 OP 71827 |
| | ) | |
| ELENZIA BOOKER, | ) | Honorable |
| | ) | Thomas Cushing, |
| Respondent-Appellee. | ) | Judge Presiding. |

_____

JUSTICE BURKE delivered the judgment of the court, with opinion.
Presiding Justice Gordon and Justice McBride concurred in the judgment and opinion.

**OPINION**

¶ 1     This appeal arises following the circuit court's denial of petitioner Kathleen Richardson's

petition for a plenary order of protection under the Illinois Domestic Violence Act of 1986 (Act)

(750 ILCS 60/101 *et seq.* (West 2020)) against her former boyfriend, respondent Elenzia Booker.

Petitioner sought the order of protection following a physical altercation between her and

respondent in their shared home, where, *inter alia*, respondent punched petitioner in the back of

the head. In her amended petition and in her trial testimony, petitioner detailed four incidents of

abuse during her relationship with respondent. The circuit court denied the petition following a

hearing finding that petitioner's credibility was damaged where her testimony regarding one of the

incidents went substantially beyond the allegations in her petition. The court found that, based on the evidence presented, it was equally likely that either petitioner or respondent started the physical altercation between the parties. The court therefore found that petitioner had failed to carry her burden on the petition.

¶ 2    On appeal, petitioner contends that the court erred in denying her petition where the evidence showed that respondent abused her and that his abuse was not a justifiable use of force. Petitioner maintains that respondent admitted to abusing petitioner in his testimony, but the court erred in finding that respondent was justified in his use of force because petitioner may have been the aggressor. Petitioner also asserts that the court erred in ignoring evidence of respondent's past abuse. For the reasons that follow, we reverse and the judgment of the circuit court and direct the court to enter a plenary order of protection in favor of petitioner and against respondent.

¶ 3                            I. BACKGROUND

¶ 4    On March 18, 2021, petitioner filed a *pro se* petition for an order of protection against respondent. That same day, the court issued an emergency order of protection that was set to expire on April 8, 2021. The expiration date was extended several times. On June 21, 2021, petitioner was granted leave to file an amended petition with the assistance of counsel.

¶ 5    Petitioner attached to the amended petition an affidavit setting forth the basis for the order of protection. In the affidavit, petitioner detailed four instances of abuse during her relationship with respondent. The most recent incident took place on March 14, 2021, where the parties got into an argument about a trip they were planning. Respondent threw money at petitioner and petitioner poured a bottle of water on him. Respondent then punched petitioner in the back of the head. Respondent choked petitioner and told her that he was going to kill her. Respondent

eventually let petitioner go and left the apartment. Petitioner went to the police station the next day and was taken to the hospital for evaluation.

¶ 6    The second event detailed in petitioner's affidavit took place on June 30, 2020. Respondent was at their shared home with a "female friend." Respondent said the female friend was going to sleep in his room so that she could get some rest. Respondent became upset when petitioner questioned why the female friend was sleeping in his room. Petitioner walked away from respondent and then was "hit in the butt with a watch." Respondent then knocked some clothes out of petitioner's hand and yelled at her.

¶ 7    Petitioner next recounted an event that occurred on September 3, 2015. Petitioner alleged that she and respondent got into a verbal argument that escalated into him physically assaulting her. Respondent grabbed her arms, grabbed her neck, gouged his thumbs into her neck, threatened to kill her, threw her on the bed, put blankets over her head, and kicked her down a flight of stairs. After the incident, petitioner called police and was treated at the hospital.

¶ 8    Finally, petitioner recounted an event that occurred on January 25, 2015. Petitioner was at respondent's apartment with her sister. Petitioner and respondent got into an argument, and respondent became "enraged." Respondent flipped over a coffee table, and it struck petitioner on her left ankle. Respondent then physically moved petitioner's sister out of the way to reach petitioner. Respondent wrestled petitioner to the ground and then dragged her out of the apartment by her ankle.

¶ 9                                    A. Trial Testimony

¶ 10    The court held a remote Zoom hearing on petitioner's petition on July 27, 2021. At the hearing, petitioner testified that she and respondent began dating in September 2014.[1] She testified that she lived with respondent and they had two children, aged five and one years old. She further testified that she "definitively" separated from respondent on March 14, 2021, prior to filing the petition for an emergency order of protection. Petitioner testified that respondent was violent toward her during the course of their relationship and testified about the four dates detailed in her petition.

¶ 11                                    1. *March 14, 2021*

¶ 12    Petitioner first testified about an incident that occurred on March 14, 2021, at approximately 3 a.m. Petitioner testified that while their children were asleep, she and respondent began to argue about a trip they had planned. Petitioner testified that respondent had been drinking at a bar that night and returned home intoxicated. When respondent got home, he grabbed the money that they had been saving for the trip and started throwing it at petitioner. As the two continued arguing, one of their children woke up. Petitioner went to make the child a bottle, but respondent grabbed her.

¶ 13    Petitioner then went to get her jacket, so that she could leave the apartment. On her way to the front door, she encountered respondent. Petitioner testified that she became "frustrated" and grabbed a bottle of water and "dumped" water on respondent's face. Petitioner then turned her back on respondent to grab the rest of her belongings and respondent struck her in the back of the head with his hand. Petitioner fell forward and hit her face on the wall. Petitioner testified that

---

[1]Petitioner acknowledged that, in her petition, she wrote that she and respondent began dating in September 2015, but she testified that this was a typographical error and she intended to write 2014.

respondent struck her hard enough to create a "knot" about the size of an egg on the back of her head and she suffered bruising on her face from where she hit the wall.

¶ 14    Petitioner then stumbled into the bedroom and respondent followed, yelling at her. Respondent pushed petitioner against the window and the two continued "wrestling." Respondent attempted to put his arms around petitioner's neck, but petitioner bit him and then dropped her body weight to the ground to get him off balance. Petitioner ended up on top of respondent with her back to his chest. Respondent put his arm around petitioner's neck and started "squeezing." Respondent then wrapped his legs around petitioner and held her in a "mixed martial arts" style chokehold. Petitioner testified that respondent had eight months of training in mixed martial arts and had participated in one videotaped fight.

¶ 15    Petitioner testified that respondent held in her the chokehold for about 10 seconds. Petitioner was able to breathe enough to scream "don't kill me, don't kill me. I don't want to die." Respondent told petitioner that he was going to kill her and to not worry about the children. Petitioner then tapped on respondent's arm in a "submissive move," and respondent let her go. Petitioner and respondent then laid on the floor and "held each other." Petitioner asked respondent "why," but he did not respond. After about five minutes, petitioner got up and went into the room with their children. Respondent gathered his belongings, told petitioner he was leaving, and then left the apartment.

¶ 16    Petitioner went to the police station the next day. While she was at the police station, she became "sick" and had to be taken to the hospital in an ambulance. Petitioner had a contusion to the back of her head and abrasions to her chest and neck. Petitioner introduced into evidence photographs of her injuries taken by an investigator from the Department of Child and Family Services.

¶ 17    Respondent testified that he had been drinking that night, but he was not intoxicated. Respondent testified that when he returned home, he had a "particular concern" with plans that he had with petitioner. Respondent testified that petitioner had made "drastic changes" to their plans and he wanted to speak to her about the changes. He told petitioner that he had a "bone to pick" with her and tried to tell her his concerns, but she told him that she did not care about his concerns.

¶ 18    Respondent testified that the argument turned physical when he was walking down the hallway with petitioner and was throwing money "over [her] head." Petitioner picked up a half-full water bottle and threw it at respondent's face from "point blank" range. Respondent testified that the water bottle hit him in the left eye, and his eye swelled up a "little bit." After petitioner threw the bottle of water at him, respondent reacted "immediately" and hit petitioner in the back of the head. Petitioner turned around to face respondent and started "swinging" at respondent. Petitioner hit him with an open hand across his left shoulder. Respondent grabbed petitioner's arms and wrestled with her for 10 or 15 seconds. Respondent testified that he suffered injuries to his fingers as a result of trying to hold onto petitioner's hands. Respondent wrapped his arms around petitioner to try to subdue her, but she "dropped her weight down," and both petitioner and respondent fell backward.

¶ 19    Respondent denied choking petitioner and denied telling her that he would kill her. Respondent testified that the altercation ended when petitioner bit him. Respondent let her go and the two of them sat on the floor exhausted. After 10 minutes, respondent stood up, grabbed his clothes, and left the house. Respondent acknowledged that he did not submit photographic evidence of the injuries to his eye or his fingers.

¶ 20                                    2. *June 30, 2020*

¶ 21    Petitioner next testified regarding an incident that occurred on June 30, 2020, around midnight. Petitioner testified that she and respondent were at their home with a "female" named Olivia. Petitioner testified that Olivia was respondent's guest and respondent was intoxicated. Petitioner and respondent got into an argument because petitioner "disagreed" about Olivia being in respondent's bedroom. Petitioner testified that respondent became violent and started pushing her. Petitioner then went to pack her belongings. While she was packing, respondent came into the bedroom and slapped the clothes out of her hands. Petitioner called her mother and put her on speakerphone while she continued packing. Petitioner testified that she called her mother because there had been "other altercations of violence" with respondent and she wanted a witness in case something happened.

¶ 22    While petitioner was moving around the home, collecting her belongings, respondent threw her down to the floor by her neck. Petitioner asked respondent why he was hitting her and asked him "what did I do[?]" Petitioner also testified that after Olivia left the house, respondent threw his watch at her, and the watch struck her on the backside. Petitioner left their house with the children and did not return for a month.

¶ 23    Petitioner's mother testified that when petitioner called her, petitioner sounded upset and was crying. Petitioner's mother could hear respondent's voice over the phone and testified that he sounded upset. Petitioner's mother heard petitioner saying, "[S]top hitting me. Why are you hitting me?"

¶ 24    Respondent testified that in June 2020, he and petitioner were taking a break, and he was dating Olivia. He and petitioner had an agreement that they could date other people but could not bring them to the house. Respondent testified that he brought Olivia to the house that night anyway

to meet petitioner. Respondent testified that the three of them were in the garage, smoking and drinking until respondent suggested that Olivia sleep in his room and he would sleep on the couch. Respondent testified that he and petitioner argued, but the argument never turned physical.

¶ 25                                    3. *September 3, 2015*

¶ 26    Petitioner next testified about an incident that occurred on September 3, 2015, at respondent's residence before the parties lived together. Petitioner testified that respondent was intoxicated and they had an argument. Petitioner was pregnant at the time. Petitioner was upset that respondent wanted to sleep on the couch and did not want to sleep in bed next to her. Petitioner went into the bedroom and started crying because her feelings were hurt. Respondent came into the bedroom and told petitioner to stop crying, and petitioner responded that she would just leave. Respondent told petitioner that she was not going anywhere. Petitioner testified that she started the verbal argument, but respondent turned the argument physical and started "slapping [her] around on the couch." Petitioner testified that respondent hit her with an open hand back and forth while she curled up to protect herself. Petitioner attempted to get away from respondent and ended up getting scratched on her arms.

¶ 27    Petitioner went into the bathroom to pack her belongings, and respondent followed her. Respondent attempted to push her into the bathtub, but petitioner "wrestled" him out of the bathroom into the bedroom and onto the bed. Respondent wrapped the blankets from the bed around petitioner's head and then pulled her by the ankle onto the ground. Petitioner rolled up into a ball to protect herself while respondent started punching her and "pushing [her] around." Respondent told petitioner that no one cared about her and that he could kill her and "dump" her body somewhere and nobody would be able to find her. Respondent then helped her stand up and

petitioner removed the blankets from around her head. Respondent looked at petitioner and then went to get some water.

¶ 28    Petitioner and respondent then both drank some water. After about 20 minutes, petitioner attempted to leave respondent's apartment. Respondent, however, would not let petitioner leave and stood in front of the doorway. Eventually, respondent stepped away from the doorway and petitioner was able to leave the apartment. Respondent chased her out into the hallway and caught petitioner by grabbing the backpack she was carrying on her back. Respondent then put his forearm around her neck and choked her. Respondent again told petitioner that he would kill her and no one would find her body.

¶ 29    Petitioner managed to get away from respondent when other residents of the apartment building came out into the hallway. Petitioner ran down the stairway, and respondent followed. Before reaching the bottom, petitioner turned to face respondent, and respondent kicked her down the steps. Petitioner landed on her back at the bottom of the stairs. Respondent then came downstairs, grabbed petitioner by her hair and backpack, and dragged her out of the building. Respondent went back inside the building, leaving petitioner outside.

¶ 30    After respondent left, petitioner called police. When police arrived, petitioner told them that she needed medical attention and she was transported to the hospital in an ambulance. Petitioner testified that she suffered scratches to her neck and "bodily bruises." Petitioner then introduced into evidence photographs she had taken of her injuries while she was in the hospital, as well as medical records.

¶ 31    When respondent's attorney asked him about the September 3, 2015, altercation, respondent testified that he did not remember that date based on petitioner's testimony. He testified, however, that during the course of their relationship, he never kicked petitioner down the

stairs and never put blankets over her head. He also denied that he had ever choked petitioner or told her that he was going to kill her.

¶ 32                                      4. *January 2015*

¶ 33    Petitioner finally testified about an incident that occurred in January 2015 at respondent's apartment. Petitioner's sister, Kimberly Simmons (Kimberly), was present for the incident. Petitioner testified that she and respondent got into an argument that turned physical when respondent "launched" a wooden coffee table across the room. Petitioner testified that the coffee table bounced off the refrigerator and landed on her foot. Respondent then attempted to physically remove both petitioner and Kimberly from the apartment. He first grabbed petitioner's arms and attempted to walk her out of the apartment, but petitioner fought back. Petitioner wanted to collect her belongings before she left the apartment.

¶ 34    Petitioner fell to the ground, and Kimberly fell on top of her. Respondent then pulled both women out of the apartment by grabbing petitioner's ankle and dragging her into the hallway. Respondent closed and locked the apartment door. Petitioner started banging on respondent's door until respondent opened the door, grabbed petitioner by the neck, and told her to stop. Respondent closed and locked the door again. Petitioner testified that she suffered injuries to her right foot and chest and had some bruising. Petitioner submitted into evidence photographs that she had taken of her injuries.

¶ 35    Kimberly testified that she did not know what respondent and petitioner were arguing about, or how the argument started, but testified that respondent initiated the physical violence when he "tossed" a coffee table toward her and petitioner. Kimberly testified that the table hit petitioner on the foot. After he tossed the table, respondent grabbed Kimberly, moved her out of the way, and tackled petitioner to the ground. Respondent then grabbed petitioner by the ankle and

tried to drag her out of the apartment. Petitioner was trying to break free from respondent, but she could not. Respondent dragged petitioner into the hallway, where they continued to "tussle" until Kimberly stepped in between. Respondent then slammed the door to the apartment and locked them outside. Kimberly testified that, after the incident, petitioner had a swollen ankle, scratches on her neck, and a sore body. Kimberly testified that, during the struggle, she heard respondent tell petitioner to "be quiet or else."

¶ 36    Respondent testified that he and petitioner were arguing when he asked her to leave. He testified that, at the time, they were "barely" dating and petitioner's name was not on the lease for his apartment. Petitioner responded that she would not leave, so respondent tried to "guide" her out of the apartment. Petitioner still refused to leave, so respondent tried to physically remove her. Petitioner fought back by "kicking doors, hanging onto the door frame," and falling to the ground and grabbing the door jamb. Respondent acknowledged that he grabbed petitioner by her foot in an attempt to make her let go of the door jamb. Respondent testified that, during this struggle, Kimberly was encouraging petitioner to leave the apartment on her own. Respondent acknowledged that he flipped over a coffee table but testified that he did not expect it to go toward petitioner.

¶ 37                                B. Court Ruling

¶ 38    In rendering its judgment, the court stated that it considered the demeanor of the parties and all the witnesses while testifying. The court stated that it considered each of the four events that were subject of petitioner's testimony. The court noted that it did not "discount" the incidents that took place in 2015 but considered that there were five years between the 2015 events and the June 2020 incident. The court stated that it was more concerned with the incidents from 2020 and 2021, but considered the 2015 incidents relevant to the question of who the aggressor was in the

June 2020 and March 2021 incidents. The court nonetheless found that the 2015 incidents were of "limited relevance."

¶ 39    The court stated that, in its view, the operative question was "did the Respondent initiate[ ] a physical fight" on March 14, 2021. The court noted that both parties acknowledged respondent was throwing money at petitioner. The court observed that there was a conflict in the testimony; petitioner testified that respondent was hitting her with the bills, but respondent testified he was throwing them over her head. Nonetheless, the court found that while this behavior might be aggressive, it was not "something that's violent." The court also observed that there was a conflict between petitioner's testimony that she poured water on respondent, while respondent testified that she hit him in the face with a water bottle. Both parties agreed that respondent then hit petitioner in the back of the head.

¶ 40    In order to determine whether the physical confrontation was prompted by petitioner or respondent, the court then looked to the June 2020 incident. The court found that petitioner's testimony of this incident went "substantially" beyond the allegations of her amended petition, which was prepared with the assistance of counsel. The court found that there was nothing in the petition about physical violence or that petitioner was so afraid that she called her mother. The court found that these discrepancies "damage[d] the Petitioner's credibility." The court found that—with petitioner's credibility damaged and with no corroborating evidence for the events of March 14, 2021—the court could not say that "it's more probably true than not true that she poured water on him rather than hitting him in the face with a water bottle." The court therefore vacated the emergency order of protection and denied petitioner's petition for a plenary order of protection. This appeal follows.

¶ 41                                    II. ANALYSIS

¶ 42    On appeal, petitioner contends that the court erred in denying her petition where the evidence presented of respondent's abuse entitled her to an order of protection. Petitioner maintains that respondent admitted to abusing petitioner in his testimony, but the court erred in finding that respondent was justified in his use of force because petitioner may have been the aggressor. Petitioner also contends that the court erred as a matter of law in ignoring evidence of respondent's past abuse.

¶ 43                            A. Plenary Order of Protection

¶ 44    A petitioner alleging abuse and seeking an order of protection has the burden to establish by a preponderance of the evidence that abuse has occurred. *Best v. Best*, 223 Ill. 2d 342, 348 (2006). The trial court's determination as to whether the petitioner has met her burden will not be disturbed unless it is against the manifest weight of the evidence. *Id.* at 348-49. Under this standard, we give deference to the trial court as the finder of fact because it is in the best position to observe the demeanor of the parties and the witnesses. *Id.* at 350. "A reviewing court will not substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn." *Id.* at 350-51 (citing *In re D.F.*, 201 Ill. 2d 476, 499 (2002)). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented. *Id.* at 350.

¶ 45                                    1. *Abuse*

¶ 46    Petitioner first asserts that the central question at the hearing was whether respondent had abused petitioner. Petitioner contends that the circuit court failed to address this primary consideration, instead focusing on which party was the "aggressor." Petitioner maintains that the

evidence presented demonstrated that respondent abused petitioner. Petitioner asserts that under the Act, the court was therefore required to enter an order of protection.

¶ 47    We agree with petitioner that the Act provides that once the trial court finds that the petitioner has been abused, " 'an order of protection *** *shall issue*.' " (Emphasis in original.) *Id.* at 348 (quoting 750 ILCS 60/214(a) (West 2004)). Under the Act, abuse is "physical abuse, harassment, intimidation of a dependent, interference with personal liberty or willful deprivation." 750 ILCS 60/103(1) (West 2020). The circuit court here seemed to place little emphasis on the question of whether petitioner was abused, instead focusing almost entirely on the question of whether petitioner or respondent was the aggressor.

¶ 48    The trial court should have addressed the question of whether respondent was justified in his use of force only after it found petitioner had been abused. See *id.* § 214(e)(1). Instead, the court seemed to put the cart before the horse, focusing only on whether respondent was justified in his use force. Nonetheless, the court's consideration of whether respondent was justified in his use of force against petitioner suggests that the court found abuse and moved on to the second step of the analysis in determining whether respondent was justified in his use force without explicitly stating that it found abuse.

¶ 49    We find that the evidence presented supports a finding that respondent abused petitioner. We acknowledge that the trial court made a finding that petitioner was not credible with regard to her testimony of the June 2020 incident, where her testimony went substantially beyond the allegations made her in petition. However, that credibility determination seemed to relate only to that incident and did not extend to petitioner's testimony regarding the other incidents. Notably, the evidence of abuse was undisputed at the hearing. Petitioner testified that on March 14, 2021, respondent struck her on the back of the head causing a "knot" about the size of an egg. Respondent

acknowledged that he hit petitioner in the back of the head. Petitioner also presented testimony that in January 2015 respondent threw a coffee table that struck her on the foot. Again, respondent acknowledged in his testimony that he thew the coffee table and that it struck petitioner. Having found abuse occurred, we may now consider, as the circuit court did, whether respondent was justified in his use of force such that a plenary order of protection should not issue.

¶ 50                                    *2. Justifiable Use of Force*

¶ 51     Section 214(e)(1) of the Act provides that the trial court may deny a remedy if the respondent has cause for the use of force that satisfies the standards for justifiable use of force provided by Article 7 of the Criminal Code of 2012 (Criminal Code) (720 ILCS 5/art. VII (West 2020)). 750 ILCS 60/214(e)(1) (West 2020). Article 7 of the Criminal Code provides:

"§ 7-1. Use of force in defense of person.

(a) A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony.

(b) In no case shall any act involving the use of force justified under this Section give rise to any claim or liability brought by or on behalf of any person acting within the definition of "aggressor" set forth in Section 7-4 of this Article, or the estate, spouse, or other family member of such a person, against the person or estate of the person using such justified force, unless the use of force involves willful or wanton misconduct." 720 ILCS 5/7-1 (West 2020).

A claim of justified use of force includes proof of the following elements:

> "(1) unlawful force threatened against a person, (2) the person threatened was not the aggressor, (3) the danger of harm was imminent, (4) the use of force was necessary, (5) the person threatened actually and subjectively believed a danger existed that required the use of force applied, and (6) the beliefs of the person threatened were objectively reasonable." *People v. Gray*, 2017 IL 120958, ¶ 50.

Here, petitioner contends that the court erred in focusing on who was the "aggressor," rather evaluating the six elements necessary to establish a justifiable use of force. We agree.

¶ 52    First, we do not accept the trial court's finding that petitioner, rather than respondent, was the aggressor in this case in the March 14 incident. Even accepting respondent's version of the events as true, he testified that he had a "bone to pick" with petitioner. Respondent then followed petitioner around their apartment, throwing money over her head while yelling at her about a vacation they were planning. The court found that while this behavior might be aggressive, it was not "something that's violent." The evidence showed that respondent then struck petitioner in the back of the head after she either (1) poured water on him or (2) threw the water bottle at him, and it struck him near the eye. Interestingly, the court could not determine which version of water bottle incident was more likely, finding that it was equally likely that either petitioner or respondent started the physical altercation between the parties. Nonetheless, the court seemed to find that respondent was not the aggressor because the act of following petitioner around the apartment and throwing money over her head did not amount to physical abuse. However, as noted, for purposes of the Act, abuse is "physical abuse, harassment, intimidation of a dependent, interference with personal liberty or willful deprivation." 750 ILCS 60/103(1) (West 2020). Thus, abuse under the Act encompasses more acts than physical abuse.

¶ 53    Nonetheless, even assuming petitioner was the aggressor during the March 14 incident as the trial court found, the court failed to evaluate whether respondent's use of force was necessary, whether he subjectively believed that a danger existed that required his use of force, and whether that use of force was objectively reasonable. Notably, if any one of these elements is negated, a claim of justifiable use of force necessarily fails. *Gray*, 2017 IL 120958, ¶ 50. Respondent did not testify that he believed his use of force was necessary. The court did not find that respondent's use of force was objectively reasonable. Further, any threat of force appears to have ended before respondent struck petitioner. Respondent struck petitioner in the back of the head as retaliation, not in an effort to defend himself from an imminent threat of unlawful force. We therefore find that the court erred in finding that respondent was justified in his use of force.

¶ 54                                    *3. Past Abuse*

¶ 55    We further find that the court erred in failing to fully consider the evidence petitioner presented of past instances of abuse. In addition to the March 14 incident, petitioner testified regarding altercations that occurred in June 2020, September 2015, and January 2015. During petitioner's testimony about the September 2015 incident, the court interrupted counsel's examination to ask if petitioner had filed for an order of protection following the event. Counsel responded that petitioner did. Counsel informed the court that, "[a]n emergency order of protection was granted, but my understanding is it later lapsed." After hearing this, the court encouraged petitioner's counsels to conference. The court stated that there may be "some relevance" to these incidents, but the court was concerned about investing "a substantial amount of time on an incident that I've just learned already resulted in a remedy for the Petitioner." The court permitted counsel to continue to elicit testimony about the incident, but informed counsel that "the relevance of something six years ago for which the parties have already been to court and had an opportunity

to seek relief from a judge is tenuous. Tenuous." In issuing its ruling, the court stated that the incidents from 2015 were of "limited relevance," and the court considered them relevant only to the question of who the aggressor was in the June 2020 and March 2021 incidents.

¶ 56    The trial court's determination that the 2015 incidents were of limited relevance because petitioner had already sought a remedy based on those incidents finds no support in the law. In fact, the Act expressly directs courts to consider instances of past abuse. Section 214 of the Act provides that in determining whether to grant a specific remedy, the court should consider

> "the nature, frequency, severity, pattern and consequences of the respondent's *past abuse*, neglect or exploitation of the petitioner or any family or household member, including the concealment of his or her location in order to evade service of process or notice, and the likelihood of danger of future abuse, neglect, or exploitation to petitioner or any member of petitioner's or respondent's family or household." (Emphasis added.) 750 ILCS 60/214(c)(1)(i) (West 2020).

The Act does not provide that the court should assign less weight to instances of past abuse if the petitioner has already sought a remedy for that past abuse.

¶ 57    The court's error is considerable because the evidence presented regarding the January 2015 incident in particular shows uncontested evidence of physical abuse. Petitioner testified that, during an argument, respondent flipped over a coffee table that struck her on the foot. Kimberly corroborated petitioner's testimony. Respondent did not deny that he flipped over the table and that it struck petitioner, but merely testified that he did not expect the table to go toward petitioner. This was evidence of abuse that the court should have considered in determining whether abuse occurred and whether to issue the plenary order of protection, and not solely for its relevance as to

who was the aggressor on March 14, 2021. Notably, respondent did not contend that he was justified in his use of force during the January 2015 incident.

¶ 58     We find this court's ruling in *Dibenedetto v. Dibenedetto*, 2019 IL App (3d) 180761 instructive. In *Dibenedetto*, a wife filed a petition for an order of protection against her husband after more than 45 years of marriage. *Id.* ¶ 3. The wife alleged that the husband "verbally abused her, insulted her daily, routinely humiliated her in public, tracked her movements, threatened to kill her, frequented her place of work to cause problems, and physically abused her in the past." *Id.* The wife testified that the husband emotionally, verbally, and physically abused her throughout the course of their marriage and that his abuse had recently increased. *Id.* ¶ 5. The wife detailed the husband's history of abuse, dating back to 1979. *Id.* ¶ 6. The wife obtained an order of protection against the husband in 1999, but she withdrew her petition after the parties attended counseling. *Id.* The wife testified that the husband's abusive behavior had escalated in 2018 when he repeatedly threatened to kill her and put a GPS tracking device on her vehicle. *Id.* ¶ 7. The parties' daughter also testified about the abuse she had seen her father commit against her mother over the years. *Id.* ¶ 8. In entering the order of protection, the court said that its finding was based on the fact that the husband's abuse started 35 or 40 years ago and then continued to escalate. *Id.* ¶ 10. " 'I mean, he continued to do those kind[s] of things.' " *Id.* On appeal, this court found that the circuit court had satisfied the statutory requirements for entering an order of protection under the Act and found that the husband had forfeited his argument that the court's finding of abuse was against the manifest weight of the evidence. *Id.* ¶¶ 18, 20.

¶ 59     Respondent contends that *Dibenedetto* does not support petitioner's argument because that case detailed a persistent pattern of abuse. Respondent asserts that, in this case, in contrast, there was a five-year gap between the incidents, showing no such pattern. However, there is no

requirement that an order of protection should issue only if the respondent's past abuse is "persistent." Rather, the Act directs the court to consider "the nature, frequency, severity, pattern and consequences of the respondent's past abuse." 750 ILCS 60/214(c)(1)(i) (West 2020). Here, the court failed to do so, finding that the 2015 incidents were of limited relevance, despite the fact that they illuminate the frequency, severity, and pattern of respondent's abuse of petitioner. As *Dibenedetto* demonstrates, evidence of abuse is relevant to the determination of whether abuse occurred, whether it occurred 40 years ago or 5 years ago. The *Dibenedetto* court also found it immaterial that the wife had previously sought an order of protection but allowed it to lapse. This is consistent with the principles of Act, and it was error for the court here to disregard these past instances of abuse in determining that an order of protection should not issue.

¶ 60     We find that the evidence presented demonstrates that respondent abused petitioner. The evidence does not show that respondent was justified in his use of force. Accordingly, the circuit court should have granted petitioner's petition and entered a plenary order of protection in favor of petitioner and against respondent. We therefore reverse the trial court's judgment and remand the matter so that the court may enter a plenary order of protection.

¶ 61                                III. CONCLUSION

¶ 62     For the reasons stated, we reverse the judgment of the circuit court of Cook County, and we remand to the trial court for the court to enter a plenary order of protection consistent with this order.

¶ 63     Reversed and remanded with directions.

*Richardson v. Booker*, 2022 IL App (1st) 211055

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 21-OP-71827; the Hon. Thomas Cushing, Judge, presiding. |
| **Attorneys for Appellant:** | Benjamin C. Weinberg and Benjamin S. Paulsen, of Dentons US LLP, and Teresa A. Sullivan, of Legal Aid Chicago, both of Chicago, for appellant. |
| **Attorneys for Appellee:** | Ari Williams, of Ari Williams Law, LLC, of Chicago, for appellee. |
| *Amici Curiae* | Sarah Weber, Lari Dierks, and Sarah Scruton, of Katten Muchin Rosenman LLP, Jaclyn Zarack Koriath, Denice Wolf Markham, Margaret Duval, Miguel C. Keberlein Gutiérrez, and Elizabeth Payne, all of Chicago, Sarah Megan, of West Chicago, Christine Raffaele, of Springfield, Susan M. Simone, of East St. Louis, and Sasha Drobnick, of Washington D.C., *amici curiae* Domestic Violence Legal Empowerment and Appeals Project *et al.* |