2023 IL App (1st) 230011

No. 1-23-0011

Opinion filed November 22, 2023

Third Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| A.A., | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 21 OP 78104 |
| | ) | |
| NITA A., | ) | Honorable |
| | ) | Beatriz Frausto-Sandoval, |
| Respondent-Appellant. | ) | Judge, presiding. |

_____

JUSTICE R. VAN TINE delivered the judgment of the court, with opinion.
Justices Lampkin and D.B. Walker concurred in the judgment and opinion.

**OPINION**

¶ 1     Nita A. appeals from the trial court's issuance of an order of protection against her and on behalf of her adult child, A.A., pursuant to the Illinois Domestic Violence Act of 1986 (Act) (750 ILCS 60/101 *et seq.* (West 2020)). Nita argues that (1) the trial court lacked jurisdiction to hear A.A.'s petition for an order of protection, (2) the statute of limitations barred A.A. from filing such a petition, (3) the trial court improperly admitted certain electronic messages between Nita and A.A., and (4) the trial court's ruling was against the manifest weight of the evidence. For the following reasons, we affirm.

¶ 2                                           I. BACKGROUND

¶ 3      On October 6, 2021, A.A filed a petition for an order of protection against their mother, Nita.[1] A.A. alleged that, from 2014 through 2021, Nita harassed and abused A.A. because A.A. is transgender.

¶ 4      At a hearing on the petition, A.A. testified that they began attending the California Institute of Technology (Caltech) in 2013. Nita moved from New Jersey, where A.A. grew up, to live with and provide housekeeping for A.A. while A.A. attended Caltech. A.A. maintained that Nita's move to California was unnecessary because A.A. could live independently without difficulty. During this time, Nita "closely monitored" A.A.'s e-mails and text messages. If A.A. did not respond to Nita's messages, Nita would send a "barrage" of single-character text messages to make A.A.'s phone "buzz 100 times in a row." Nita told A.A. that she assumed A.A. was "off doing LGBT behaviors" when A.A. did not respond to messages.

¶ 5      From March 2014 to May 2015, Nita sent A.A. Gmail chat messages criticizing A.A. for being transgender and for associating with lesbian, gay, bisexual, transgender, and queer (LGBTQ) individuals. Screenshots of these messages, which A.A. moved into evidence over Nita's objections, include the following:[2]

> "lay off lgbtq crap or else"
>
> "you have been screwed by *** and caltech deans and dragged and drugged, straight to lgbtq alter to be sacrificed"

---

[1] The record and briefs indicate that A.A. uses they/them pronouns, so that is what we will use in this order. See *People v. Boots*, 2022 IL App (2d) 200640, ¶ 1 n.1.

[2] We set out these text messages as they appear in the record, with no corrections of typographical errors or omissions of inappropriate language because they are evidence of Nita's abuse of A.A. We have only omitted the names of individuals who are not involved in this case.

"you are so mature to manipulate us parents, than [*sic*] you are equally mature to protect your mind and your self from these lgbtq community and predators"

"I guess TAs don't mind you emailing for tickets to alice in wormhole for your lgbtq gang of goons but they do mind your mom talking to you for good things, right?"

"you are at Caltech for education and your degree with high gpa, above 3.5, not to screw around with everything and go to hell and be a kept woman in lgbtq hell by the KKK of lgbtqs are Caltech"

"young man go home to your mamma she make you a real girl or I beat the crap out of you for leaving your mama in hell"

"stop being lgbtq"

"who ever is preaching that you should adopt male pronouns and live like a man for one year before they can approve your sex change surgery, meaning you mutating your body and becoming a major freak is taking you for a ride"

"sure, lgbtq away to death"

A.A. testified that these messages caused "significant stress, including depression, anxiety, [and that they had] difficulty engaging with school."

¶ 6     In the spring of 2016, A.A. moved to a dormitory on Caltech's campus and asked Nita not to contact them. Nita tried to find A.A. on campus and asked university staff, relatives, and acquaintances how to contact A.A. Throughout 2016, Nita sent A.A. multiple e-mails, text messages, and voicemails every day. A.A. routed Nita's e-mails to a separate folder and checked it occasionally.

¶ 7    In the summer of 2016, A.A. obtained a prescription for hormone replacement therapy; Nita somehow learned about this and e-mailed A.A. about "the dangers of testosterone." Near the end of 2016, A.A. briefly met Nita to retrieve A.A.'s belongings and "repeated that [they] had no desire for further contact or to live with [Nita]." In 2017, Nita mailed A.A. a package, called the campus mail center when it arrived, and waited on the phone to speak to A.A. Nita also went uninvited to Caltech's campus on A.A.'s graduation day in 2017 and asked to take a photograph with A.A. A.A. was upset and returned to their dorm room despite wanting to be out with their friends because they were worried about encountering Nita again.

¶ 8    After graduating from Caltech, A.A. moved to San Bruno, California. A.A. briefly met Nita in July 2018 to pick up a package from A.A.'s grandmother. In August 2018, A.A. filed paperwork to legally change their name and gender. Nita sent A.A. e-mails claiming that people would discover the name and gender change and would go to A.A.'s home to kill them.

¶ 9    A.A. then moved to Chicago to pursue a master's degree at the University of Chicago. Nita offered to pay A.A.'s rent, health insurance, and tuition. A.A. agreed because their parents had already set aside certain funds for university expenses, which "would otherwise go to waste." Nita pretended to encounter difficulties sending money so that she could contact A.A. and obtain information such as A.A.'s address. In November 2019, Nita insisted on meeting A.A. in person to deliver debit and credit cards issued under A.A.'s former name. A.A. met Nita for approximately five minutes at a bookstore in Chicago and left feeling "frustrated and harassed" and like they were "being emotionally pressured into" allowing Nita to provide financial support. A.A. did not use the cards that Nita gave them.

¶ 10    In the spring of 2020, A.A. moved from Chicago to their parents' home in New Jersey due to the COVID-19 pandemic. A.A. asked Nita not to discuss medical or academic issues during that time, but Nita "soon reverted back to discussing those topics." A.A. moved out in late summer 2020 and asked Nita not to contact them. Nita continued to send A.A. e-mails and text messages through the end of 2020.

¶ 11    In May 2021, A.A. traveled to Berkeley, California, for "top surgery," which is a gender-confirming bilateral mastectomy. In July 2021, A.A. unexpectedly encountered Nita on the street in Berkeley. Nita told A.A. to travel to New Jersey to visit their grandmother; A.A. walked away. A.A. later contacted Nita to arrange a Zoom video call with their grandmother, but Nita refused to do so.

¶ 12    Between September and November 2021, A.A. received e-mails and voicemails in which Nita said that she knew A.A. was pursuing a Ph.D. at Northwestern University, which A.A. had not told her about. Nita also sent photographs of Northwestern's campus and claimed that she had visited it. On November 8, 2021, Nita left A.A. a voicemail saying that A.A. needed to move closer to campus, which concerned A.A. because it implied that Nita knew where A.A. lived. As of the hearing on the petition, Nita was not financially supporting A.A. A.A. testified that, without an order of protection, Nita would continue to harass them.

¶ 13    Nita testified that she lived with A.A. in Pasadena, California, from 2013 to spring 2016. Nita worried about A.A.'s allergies, health, and academic workload when they were an undergraduate student, which was why she was concerned when A.A. did not respond to her messages. Nita denied that she accessed A.A.'s e-mail and social media accounts. Nita paid A.A.'s tuition and living expenses at Caltech. Nita testified that she could not remember whether she

contacted A.A. after A.A. severed communication with her in the spring of 2016. Nita and A.A.'s father attended A.A.'s graduation at Caltech in June 2017 because "it was a proud moment" and they were not "told explicitly not to come."

¶ 14    In 2020, Nita drove A.A. from Chicago to New Jersey, where they lived together for approximately three months. When Nita and A.A. lived together in California and New Jersey, Nita cooked, cleaned, did laundry, and provided transportation for A.A. In August 2020, Nita drove A.A. back to Chicago, cleaned their apartment, and paid for movers and a new apartment. When Nita encountered A.A. on the street in Berkeley in July 2021, it was a coincidence because Nita was accompanying her husband on a trip to view real estate investments. During that encounter, Nita asked A.A. to call their grandmother and then walked away. Nita financially supported A.A. until at least October or November 2022 and may have been paying their phone bill at the time of the hearing. Nita testified that she loved A.A. unconditionally.

¶ 15    The court issued a plenary order of protection that ordered Nita to stay away from and not threaten or abuse A.A. for six months.[3] The court described Nita's text messages to A.A. as "hurtful," "judgmental," and "mean" and explained that any reasonable person would feel harassed upon receiving those messages. The court reasoned that A.A. occasionally communicating with, living with, and accepting financial support from Nita did not negate the abuse that occurred. The court issued a six-month order of protection as opposed to a two-year order because the strongest evidence of abuse was from 2014 and it was possible that Nita could have a loving relationship with A.A. in the future.

---

[3]A plenary order of protection is the longest type of order of protection authorized by the Act and can last up to two years. See 750 ILCS 60/220(b)(0.05) (West 2020).

¶ 16    Nita filed a motion to vacate or reconsider the order of protection. She argued that (1) the general five-year statute of limitations for civil claims barred A.A.'s allegations of abuse that occurred in 2014 and 2015, (2) A.A. voluntarily maintained contact with Nita and relied upon her for financial support, (3) the order of protection was a "severe penalty" that did not achieve "substantial justice," and (4) A.A. did not establish by a preponderance of the evidence that Nita abused A.A. In response, A.A. argued that (1) under *Richardson v. Booker*, 2022 IL App (1st) 211055, the court properly considered evidence of abuse that occurred more than five years prior to A.A. filing the petition; (2) A.A. explicitly severed contact with Nita in the spring of 2016; (3) Nita failed to explain how the order of protection was a "severe penalty"; and (4) the trial court did not err in finding that Nita abused A.A.

¶ 17    The trial court denied Nita's motion to vacate or reconsider. The court found that the general civil five-year statute of limitations did not apply to A.A.'s petition and that the court properly considered evidence of abuse that occurred more than five years before A.A. filed the petition. The court also rejected Nita's argument that A.A. invited communication and accepted financial support from Nita, finding that A.A. could not be "penalized on that basis." In addition, the court rejected Nita's claim that the order of protection was a "severe penalty," explaining that she had not been charged criminally and the order of protection was unlikely to cause further negative consequences for her. Finally, the court reiterated that A.A. met their burden of proof.

¶ 18    Nita timely appealed.

¶ 19                                    II. ANALYSIS

¶ 20    On appeal, Nita argues that (1) the trial court lacked jurisdiction to hear A.A.'s petition for an order of protection, (2) the statute of limitations barred A.A.'s petition, (3) the trial court

improperly admitted Nita's messages to A.A., and (4) the trial court's decision to grant an order of protection was against the manifest weight of the evidence.

¶ 21    The Act provides that "any person abused by a family or household member" may file a petition for an order of protection. 750 ILCS 60/201(a)(i), (b)(i) (West 2020). A family or household member includes parents and "persons who share or formerly shared a common dwelling." *Id.* § 103(6). Abuse under the Act includes "harassment" (*id.* § 103(1)), which means "knowing conduct which is not necessary to accomplish a purpose that is reasonable under the circumstances; would cause a reasonable person emotional distress; and does cause emotional distress to the petitioner" (*id.* § 103(7)). "If the court finds that petitioner has been abused by a family or household member *** an order of protection prohibiting the abuse, neglect, or exploitation shall issue." *Id.* § 214(a).

¶ 22                              A. Appellate Jurisdiction

¶ 23    Before we turn to Nita's arguments, we must address A.A.'s contention that this court lacks jurisdiction to hear this appeal. A.A. argues that this appeal is moot because the order of protection expired on February 9, 2023.

¶ 24    An appeal is moot "where it presents no actual controversy or where the issues involved in the trial court no longer exist because intervening events have rendered it impossible for the reviewing court to grant effectual relief to the complaining party." *In re J.T.*, 221 Ill. 2d 338, 349-50 (2006). In general, an appeal that challenges an order of protection that has expired is moot. *Landmann v. Landmann*, 2019 IL App (5th) 180137, ¶ 11; see also *Creaser v. Creaser*, 342 Ill. App. 3d 215, 219 (2003) (once an order of protection expires, the respondent is no longer subject

to a court order and any decision would be "essentially advisory"). The order of protection in this case expired on February 9, 2023, so it appears that this appeal is moot.

¶ 25    However, we will review this matter pursuant to the public interest exception to the mootness doctrine. Under the public interest exception, a court may review a moot issue when " '(1) the moot question is public in nature, (2) it is desirable to provide an authoritative determination so as to offer guidance for public officers, and (3) it is likely that the question will reappear.' " *Landmann*, 2019 IL App (5th) 180137, ¶ 12 (quoting *Whitten v. Whitten*, 292 Ill. App. 3d 780, 784 (1997)). Protecting transgender individuals from abuse by family members is a matter of public interest, and unfortunately, it is likely that transgender individuals will face abuse from family members in the future. There appear to be no reported appellate decisions that address how the Act applies to transgender victims of domestic abuse, so it is necessary to provide guidance as to how courts should apply the Act in cases where transgender individuals are found to be victims of harassment. See *id.* ("The Act addresses issues of great public interest, and its purposes can only be accomplished if the courts properly apply the statutory requirements."). Accordingly, we find that the public interest exception to the mootness doctrine applies and we have jurisdiction to hear this appeal.

¶ 26                              B. Trial Court's Jurisdiction

¶ 27    Nita argues that the trial court lacked jurisdiction over this case. Nita frames this argument as a challenge to the trial court's subject-matter jurisdiction, but it is more accurate to say that she challenges the trial court's personal jurisdiction. Subject-matter jurisdiction "is invoked by the filing of a petition or complaint alleging the existence of a justiciable matter." *In re Luis R.*, 239 Ill. 2d 295, 305 (2010). The Act's subject-matter jurisdiction provision states that "the circuit

courts shall have the power to issue orders of protection." 750 ILCS 60/207 (West 2020). Nita does not dispute that the trial court had the power to issue an order of protection, so she does not challenge the court's subject-matter jurisdiction.

¶ 28    Rather, Nita contends that the trial court lacked jurisdiction because the alleged abuse occurred primarily outside of Illinois. This argument attacks personal jurisdiction because "personal jurisdiction is derived from the actions of the person sought to be bound." (Internal quotation marks omitted.) See *Luis R.*, 239 Ill. 2d at 305. To obtain an order of protection, a petitioner must establish personal jurisdiction under section 208 of the Act. *Gasaway v. Gasaway*, 246 Ill. App. 3d 531, 534 (1993); 750 ILCS 60/208 (West 2020). Under section 208, a court has "jurisdiction to bind (i) State residents and (ii) non-residents having minimum contacts with this State, to the extent permitted by the long-arm statute, Section 2-209 of the Code of Civil Procedure." 750 ILCS 60/208 (West 2020). We review whether the trial court had jurisdiction *de novo*. *Blount v. Stroud*, 232 Ill. 2d 302, 308 (2009).

¶ 29    A.A.'s petition alleged that A.A. lived in Chicago and Nita lived in New Jersey. For the trial court to have personal jurisdiction over Nita, A.A. had to establish that Nita had minimum contacts with Illinois pursuant to the long-arm statute. The long-arm statute provides, in relevant part, that a court "may exercise jurisdiction in any action arising within or without [Illinois] against any person who *** [i]s a natural person present within this State when served." 735 ILCS 5/2-209(b)(1) (West 2020). The record indicates that Nita was served in open court in Cook County, Illinois, on December 1, 2021, the day after her attorney entered an appearance, providing the trial court with personal jurisdiction over her. See *id.*; see also *In re M.W.*, 232 Ill. 2d 408, 413-14, 427-

28 (2009) (court obtained personal jurisdiction over minor's parents despite no formal service of process because parents appeared in court and were given a copy of the petition).

¶ 30    Nita argues that the trial court lacked jurisdiction because the alleged abuse occurred primarily in California and New Jersey and because  "[t]he boundaries and application of the Illinois Domestic Violence Act [are] specifically in regards to the State of Illinois." Nita cites no authority to support her contention that an Illinois court cannot issue an order of protection based on abuse that occurred outside Illinois. The Act's jurisdiction provisions contain no such limitation. 750 ILCS 60/207, 208 (West 2020). Nita's interpretation of the Act as being limited to abuse that occurred in Illinois would leave a victim of abuse that occurred in another state unable to obtain an order of protection upon moving to Illinois, even if the abuser followed the victim to Illinois. Such a limitation would render Illinois ineffective as a haven for victims of domestic violence, which is contrary to the purpose of the Act. See *id.* § 102(3)-(4) (purposes of the Act include not "allowing abusers to escape effective prosecution"). Accordingly, we find that the trial court had jurisdiction to hear A.A.'s petition for an order of protection against Nita.

¶ 31                                C. Statute of Limitations

¶ 32    Nita next argues that the statute of limitations barred A.A. from filing a petition for an order of protection because the petition was based on events that occurred more than five years before A.A. filed it. Specifically, Nita argues that "A.A. should have been precluded [from bringing] any claims or evidence regarding matters prior to October 6, 2017."[4]

---

[4]A.A. filed the petition for an order of protection on October 6, 2021. If Nita is correct that a five-year statute of limitations applies, that would preclude claims that arose prior to October 6, 2016, not 2017.

¶ 33    As an initial matter, the parties conflate Nita's statute of limitations argument with an evidentiary argument. Nita's statute of limitations argument contends that A.A.'s petition for an order of protection could not be premised on events that occurred more than five years before A.A. filed the petition. However, the parties primarily construe this argument as addressing whether the court could *consider evidence* of abuse that occurred prior to October 6, 2016. These are two separate issues. We address Nita's statute of limitations argument here and her evidentiary argument below.

¶ 34    The Act contains no statute of limitations for a petition for an order of protection. 750 ILCS 60/101 *et seq.* (West 2020). However, the Act provides that "[a]ny proceeding to obtain *** an order of protection, whether commenced alone or in conjunction with a civil or criminal proceeding, shall be governed by the rules of civil procedure of this State." *Id.* § 205(a). The Code of Civil Procedure provides that a five-year statute of limitations applies to civil actions that do not have a specific statute of limitations. 735 ILCS 5/13-205 (West 2020). Nita reads these provisions together to argue that the general five-year statute of limitations applies to petitions for orders of protection. We have found no caselaw that supports this argument or that imposes any statute of limitations on petitions for orders of protection. Nita cites no such authority.

¶ 35    However, we need not decide which, if any, statute of limitations applies to a petition for an order of protection. Nita has forfeited her statute of limitations argument because she did not timely raise it in the trial court. See *Bedin v. Northwestern Memorial Hospital*, 2021 IL App (1st) 190723, ¶ 37. Nita raised the statute of limitations for the first time in her posthearing motion to vacate or reconsider the order of protection, and a party forfeits an argument that it raises for the

first time in a motion to reconsider. See *Zander v. Carlson*, 2020 IL 125691, ¶ 34. Accordingly, Nita has forfeited her statute of limitations argument.

¶ 36                                    D. Admission of Evidence

¶ 37     Nita next contends that the trial court improperly admitted messages that Nita sent to A.A. through various electronic messaging services. Nita argues that the trial court should not have admitted these messages because A.A. failed to authenticate and lay proper foundation for them and because messages from 2014 and 2015 were too remote in time to warrant admission.

¶ 38     The rules of civil procedure and evidence apply to a hearing on a petition for an order of protection. See *Best v. Best*, 223 Ill. 2d 342, 348-49 (2006); 750 ILCS 60/205(a) (West 2020). We review a trial court's ruling on the admissibility of evidence for an abuse of discretion. *Trinidad C. v. Augustin L.*, 2017 IL App (1st) 171148, ¶ 21. An abuse of discretion occurs when the court's ruling is arbitrary or fanciful or when no reasonable person would take the trial court's view. *Id.*

¶ 39                               1. Authentication and Foundation

¶ 40     Nita argues that the trial court improperly admitted the messages because A.A. failed to authenticate and lay foundation for them. We treat text messages like any other form of documentary evidence. *People v. Watkins*, 2015 IL App (3d) 120882, ¶ 36. A proper foundation for the admission of documentary evidence exists when the document has been identified and authenticated. *Id.* To authenticate documentary evidence, the proponent must demonstrate that the document is what the proponent claims it to be. Ill. R. Evid. 901(a) (eff. Sept. 17, 2019). Documentary evidence can be authenticated through direct or circumstantial evidence. *Watkins*, 2015 IL App (3d) 120882, ¶ 37. Circumstantial evidence includes "appearance, contents, substance, and distinctive characteristics, which are to be taken into consideration with the

surrounding circumstances." *Id.* Documentary evidence may also be authenticated by its contents if it contains information that would only be known by the alleged author of the document or, at the very least, to a small group of people including the alleged author. *Id.* In determining whether documentary evidence is admissible, the trial court serves a "limited screening function," assessing whether the evidence of authentication, viewed in the light most favorable to the proponent, would allow a reasonable factfinder to conclude that the document is more likely than not authentic. *Id.* ¶ 36.

¶ 41 A.A. testified that exhibits B through D were "chat screen shots" between A.A. and Nita from March 2014 to May 2015, that A.A. took the screenshots with A.A.'s phone and laptop in the spring of 2022, and that the screenshots were true and accurate depictions of the messages. A.A. further testified that the messages were from Gmail's chat system and identified Nita's e-mail address at the top of the messages. A.A. recognized that e-mail address because they had received emails from Nita at that address for years and had seen Nita use it. A.A. identified other exhibits as text messages from a specific phone number that both Nita and A.A.'s father used. A.A. knew the text messages were between A.A. and their parents because they referenced A.A.'s performance in school, grades, friends, living situation, and that A.A. had studied at both Caltech and the University of Chicago. The messages themselves contain circumstantial evidence that they were communicated between A.A. and Nita as opposed to A.A. and their father. For example, exhibit BW, dated September 17, 2020, is from "Parents" to "A" and asks "A" to "text me or daddy every day one word *** as short or as long, to me, or to your daddy." It is reasonable to conclude that this is a message from Nita to A.A. Similarly, text messages in exhibits CC and CH begin

"From Mom" or "from mumma." We find that a reasonable trier of fact could conclude that the messages were what A.A. claimed they were.

¶ 42   Nita argues that the trial court erroneously admitted the messages because "there was no way of knowing who they were from, no phone number, dates, or times." That is not accurate. Several of the Gmail chat messages and text messages between Nita and A.A. contain dated read receipts and the e-mail address and phone number of the sender. As explained above, A.A. testified to who sent the messages, which e-mail addresses and phone numbers they were sent from, which messaging services they were sent through, and when they were sent. Moreover, Nita never denied that she authored and sent the messages at issue. Accordingly, we find that the trial court did not abuse its discretion in admitting these messages over Nita's objections to authenticity and foundation.

¶ 43                                    2. Age of Messages

¶ 44   As noted above, Nita also contends that the messages from 2014 and 2015 were too far in the past for the trial court to properly consider them. The trial court concluded that it could consider such evidence pursuant to *Richardson*, 2022 IL App (1st) 211055. We agree. *Richardson* holds that evidence of past abuse is relevant to a trial court's determination as to whether abuse occurred, regardless of whether the prior abuse "occurred 40 years ago or 5 years ago." *Id.* ¶ 59. That is because the Act itself "expressly directs courts to consider instances of past abuse" without limitation as to time. *Id.* ¶ 56 (citing 750 ILCS 60/214(c)(1)(i) (West 2020)). In *Richardson*, this court found that the trial court should not have assigned only "limited relevance" to abuse that occurred in 2015 when determining whether abuse occurred in 2020 and 2021. *Id.* ¶¶ 55-57. Rather, the trial court should have fully considered that evidence and should have issued an order

- 15 -

of protection. *Id.* ¶ 60. *Richardson*'s reasoning translates to this case and clearly supports the trial court's conclusion that Nita's abuse of A.A. in 2014 and 2015 via Gmail chat message was relevant and admissible at the order of protection hearing in 2022.

¶ 45                                    E. Manifest Weight of the Evidence

¶ 46    Finally, Nita argues that the trial court's decision to grant the order of protection was against the manifest weight of the evidence. Nita contends that she cannot be blamed for being "worried and concerned about" A.A. and that A.A. voluntarily initiated contact with her and accepted financial support from her.

¶ 47    We review findings of abuse under the Act under the manifest weight of the evidence standard. *Stapp v. Jansen*, 2013 IL App (4th) 120513, ¶ 16 (citing *Best*, 223 Ill. 2d at 349-50). A finding is against the manifest weight of the evidence only when the opposite conclusion is clearly evident or where the court's findings are unreasonable, arbitrary, and not based on any of the evidence. *Id.* The trial court was in the best position to observe the conduct and demeanor of the parties, so we will not substitute our judgment for that of the trial court by reweighing the evidence. *Id.* ¶ 17. In addition, we will not overturn the trial court's findings simply because we might have reached a different conclusion about what the evidence established. *Id.*

¶ 48    We find that the trial court's decision to grant the order of protection was not against the manifest weight of the evidence. There is no dispute that A.A. and Nita are family members who lived together from fall 2013 to spring 2016 and again in the summer of 2020. See 750 ILCS 50/103(6) (West 2020). From 2014 through 2021, Nita sent A.A. harassing text messages, e-mails, and voicemails. The Third District has found that sending 27 unwanted text messages and 6 voicemails over the course of approximately two hours constitutes "stalking behavior" (*Coutant*

*v. Durell*, 2021 IL App (3d) 210255, ¶¶ 75-78), so it is reasonable to conclude that Nita sending dozens of unwanted messages over several years, despite A.A. requesting her to stop, constituted stalking behavior as well. Nita also made unwanted in-person contact with A.A. in multiple cities, including Pasadena, San Bruno, Berkeley, and Chicago after A.A. had directed her to cease contact. As recently as late 2021, Nita communicated that she knew where A.A. lived in Evanston, Illinois, and that she had visited Evanston. Altogether, the evidence showed that Nita verbally harassed and stalked A.A. despite A.A. repeatedly telling Nita to stop.

¶ 49    Furthermore, the evidence established that transphobia motivated Nita's abusive behavior. The messages from 2014 and 2015 explicitly referred to A.A.'s transgender identity and their association with LGBTQ individuals and groups. At least two of those hostile messages included suggestions of violence, such as Nita's threat to "beat the crap" out of A.A. and her suggestion that A.A. should "lgbtq away to death." In 2016 and 2018, respectively, Nita criticized A.A.'s decision to undergo hormone therapy and to change their legal name and gender. In 2019, Nita gave A.A. bank cards issued under A.A.'s "deadname," which is the name given at birth to a transgender individual that the person no longer uses after transitioning. See Christiana Prater-Lee, *#Justice4Layleen: The Legal Implications of* Polanco v. City of New York, 47 Am. J.L. & Med. 144, 145 n.18 (2021). The use of a transgender person's deadname is disrespectful. *Id.* at 145. Harassing A.A. to not express their identity as transgender is not a reasonable or necessary purpose, and A.A.'s uncontested testimony was that Nita's behavior caused emotional distress. See 750 ILCS 60/103(1), (7) (West 2020). The evidence clearly established abuse as the Act defines it and supported the trial court's decision to issue an order of protection.

¶ 50    Nita argues that, because she provided financial support for A.A. between 2013 and 2021, A.A. should not be allowed to seek protection from her abusive behavior. This argument is meritless. Merely because one adult gives another adult financial support does not absolve the adult with more resources from violating the Act. A parent providing financial support for her child, particularly in young adulthood, does not give that parent license to abuse the child. Nita cannot and did not "buy" the right to abuse A.A. Furthermore, as the trial court observed, Nita's financial support of A.A. did not negate the evidence of abuse and harassment.

¶ 51    Nita also claims that she "now has a criminal history because of the order of protection." That is incorrect. As the trial court explained to Nita in denying her motion to reconsider, a criminal conviction and being subject to an order of protection are not the same things. See *People v. Alvarez*, 2012 IL App (1st) 092119, ¶ 58; see also *Best*, 223 Ill. 2d at 348 (proceedings to obtain an order of protection under the Act are "civil in nature"). The record contains no indication that criminal charges were filed against Nita or that she was convicted of any crimes because of this order of protection. Accordingly, we find that the trial court's finding of abuse was not against the manifest weight of the evidence.

¶ 52                                    III. CONCLUSION

¶ 53    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 54    Affirmed.

---

***A.A. v. Nita A.*, 2023 IL App (1st) 230011**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 21-OP-78104; the Hon. Beatriz Frausto-Sandoval, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Lawrence A. Stein , of Lawrence A. Stein LLC, of Wheaton, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Aziza Khatoon, Benjamin J. Bennett, and Miriam Hallbauer, of Legal Aid Chicago, of Chicago, for appellee. |

---