NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 241135-U

NO. 4-24-1135

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 17, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| ANGELA GIMMELLIE, | ) | Appeal from the |
|     Petitioner-Appellee, | ) | Circuit Court of |
| v. | ) | Tazewell County |
| MICHAEL GIMMELLIE, | ) | No. 23OP893 |
|     Respondent-Appellant. | ) | |
| | ) | Honorable |
| | ) | Stephen A. Kouri, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Grischow and Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed an order granting a plenary order of protection in favor of petitioner, as the trial court's findings were not against the manifest weight of the evidence.

¶ 2    Respondent, Michael Gimmellie, appeals an order granting a plenary order of protection against him and in favor of petitioner, Angela Gimmellie. We affirm the order because the trial court's findings were not against the manifest weight of the evidence.

¶ 3                      I. BACKGROUND

¶ 4    Michael and Angela lived in Nevada before divorcing in 2018. They subsequently reconciled but did not remarry. In 2020, Michael and Angela fostered a child together. Angela later adopted the child, but Michael evidently was unable to do so because of a Nevada law prohibiting unmarried couples from adopting together. In September 2021, Michael and Angela ended their relationship and began residing separately. In early 2022, Angela moved to Illinois

with her son. Michael continued to reside in Nevada until August 2023, when he moved to Virginia.

¶ 5          On November 3, 2023, Angela filed a *pro se* petition seeking emergency and plenary orders of protection against Michael. In a seven-page, single-spaced portion of the petition, Angela chronicled experiencing harassment, much of which involved property damage, from March 2022 through October 2023. Angela did not claim to have direct knowledge that Michael was responsible for all the incidents she recounted. However, she alleged that she had similar experiences when she lived in Nevada and that she saw Michael follow her car once in Illinois in March 2022.

¶ 6          Following an *ex parte* hearing on November 3, 2023, the trial court, Judge Paul Bauer presiding, granted Angela an emergency order of protection against Michael, with Angela's son named as an additional protected party. The record on appeal does not contain a transcript of that hearing. Among other things, the order prohibited Michael from interfering with Angela's personal liberty or harassing, physically abusing, or stalking her. Michael was also ordered not to communicate with Angela and to stay at least 300 feet away from her.

¶ 7          The emergency order of protection was extended multiple times, pending a hearing on a plenary order. Eventually, that hearing was set before Judge Stephen Kouri on July 11, 2024. The trial court ordered the parties to exchange their exhibits two weeks before the hearing.

¶ 8          At the hearing on July 11, 2024, Angela represented herself and Michael appeared through counsel. Angela did not bring any exhibits to court, as she erroneously believed they were already part of the file because she showed text messages and more than 200 photographs to Judge Bauer on November 3, 2023. Angela stated that she could reproduce that evidence. Although the court expressed interest in seeing the photographs, the court sustained Michael's objection based

on Angela's failure to provide copies of her exhibits to him in advance. Thus, Angela did not present any documentary evidence at the hearing.

¶ 9        Angela testified on her own behalf. She detailed being the victim of an unusual pattern of harassment over the course of several years. According to Angela, she and Michael ended their relationship in September 2021, and she asked him to leave their residence. Immediately thereafter, she experienced a continuous pattern of harassment. For example, she discovered that her belongings were missing or had been "spray painted with some type of gold substance." She also noticed that her walls were painted with a "glitter, gold substance" that reflected light and vibrated when drones were shined into her house. She further observed that her brother's art was damaged by being painted differently. When Angela confronted Michael about these things, he either denied that anything was happening or denied being involved. He also told Angela and her family that she was having a mental health crisis. Angela testified that such harassment prompted her to move to Illinois in January 2022.

¶ 10       According to Angela, she continued to experience harassment after she moved to Illinois, albeit more intermittently. Sometimes there were weeks or months between incidents. Angela asserted that she personally saw Michael in Illinois "multiple different times." However, the only occasion she detailed in her testimony was seeing Michael follow her in a rental car in either March or April 2022. Examples of subsequent harassment included discovering that someone (1) broke into her car repeatedly and vandalized it, (2) repeatedly spray painted the interior of her home and her belongings while she was at work with the same substance she saw in her home in Nevada, (3) put a substance in her shampoo, clothes, and makeup that caused her to have allergic reactions, (4) used drones to shine lights into her house when she was home, and (5) edited her digital photographs. Angela noticed that the property damage seemed to target her,

not her son's room or belongings. Some events also seemed oddly "intimate" to Angela, such as discovering that someone had gone through her jewelry drawer and destroyed only the earrings that Michael gave her on their wedding day.

¶ 11 Angela testified that the harassment continued after she moved to a new residence within Illinois. The only time it stopped was when Michael attended a rehabilitation program. Although Michael had no direct contact with Angela after the emergency order of protection was entered in November 2023, the harassment worsened. For example, a few weeks before the hearing on the plenary order of protection, someone kicked in Angela's door and stole her notebook and flash drives.

¶ 12 Angela conceded that she had no direct evidence that Michael was responsible for the property damage, as she was not present when it occurred and the security cameras she had installed were somehow rendered temporarily inoperable around the time of the break-ins. Angela believed that someone deactivated her cameras either by accessing her phone or jamming her Wi-Fi. Angela believed that Michael was "punishing" her through the harassment because he felt she was keeping his child from him, and he was "enraged" that she adopted the child alone. Among the reasons Angela believed Michael was behind the harassment despite residing in a different state were that (1) she had experienced similar harassment while living in Nevada and (2) Michael once told her he wanted to send her son a gift, but did not want to know her address, in case something bad happened to her.

¶ 13 Angela also believed, but admitted she had no proof, that Melissa Black—whom she thought was Michael's current or former girlfriend—was assisting Michael with the campaign of harassment. Despite changing her phones three times since moving to Illinois, she believed that "they" put a tracking device on her phone or car. Angela also believed that Michael had a listening

device in her home. Angela acknowledged that Michael lacked any technological knowledge, which is why she believed that Melissa was involved with the harassment. Angela expressed being afraid that Michael and Melissa would end up killing her.

¶ 14　　　　Angela's mother, Deborah Surratt, testified. Deborah recounted that in September 2021, Angela asked Michael to move out of their home. Angela then started complaining to Deborah about odd things happening. Based in part on Deborah's conversations with Michael, she was concerned about Angela's mental health around that time, even though Angela had never had mental health issues. Angela moved to Illinois in early 2022 because she felt she was in danger and was being stalked. Angela then lived with Deborah for a few months. Deborah did not observe any signs that Angela was suffering from a mental illness, and she realized that the things Michael told her about Angela's mental health were false. Deborah recalled Angela mentioning that she had seen Michael somewhere around this time.

¶ 15　　　　According to Deborah, Angela then moved to her own house and started complaining about some of the same things she had experienced in Nevada. Deborah corroborated some of Angela's allegations about the unusual occurrences. Specifically, Deborah saw (1) "strokes" of gold paint on Angela's walls and ceilings, (2) paint on Angela's woodwork, (3) glitter all over the inside of Angela's car and on her clothes in a dresser, and (4) an odd film over Angela's car's windshield. These peculiarities continued after Angela moved to a different house in Illinois. Specifically, Deborah went out with Angela one time, and when they returned, Deborah saw and felt wet paint on a stairwell railing. Deborah also observed "pinpoint" marks on the walls and that Angela's pictures had been distorted and "messed with." Deborah believed that Michael was responsible for these occurrences, as she could not think of anyone else who would do this to Angela. Deborah testified that Angela kept her home and car locked and that only Angela

had the keys.

¶ 16 The trial court denied Michael's motion for a directed finding and determined that there was "circumstantial evidence" supporting Angela's claim.

¶ 17 Michael testified on his own behalf. He explained that he lived in Nevada until August 2023, when he moved to Virginia to live with his brother, Anthony Gimmellie, and Anthony's family. Michael insisted that, apart from attending the evidentiary hearing in connection with this case, he had only ever been to Illinois once, in either 2009 or 2010. According to Michael, since he moved to Virginia, the only time he spent a night away from his home was when he visited family in Ohio for Christmas. Michael also mentioned the logistical difficulties of getting to central Illinois from either Nevada or Virginia. For example, there were flights between Las Vegas and Peoria only on certain days of the week. There were no direct flights from Virginia, and his drive to court took him more than 14 hours.

¶ 18 Michael denied committing, directing anyone to commit, or conferring with anyone who may have committed any of the harassment that Angela alleged. He explained that he and members of Angela's family had concerns about her mental health during the last few months she resided in Nevada. He denied having "current access" to Angela's electronic devices. He also professed technological ignorance, denied ever having flown a drone, and denied knowing exactly where Angela lived. He denied knowing anybody named Melissa Black.

¶ 19 Michael introduced into evidence extensive documentation—such as employment records, airline receipts, bank statements, and photographs—which showed him to be somewhere other than Illinois on many of the dates specified in Angela's petition for an order of protection. However, Michael was unable to obtain records documenting his whereabouts on every day during the time frame at issue. Angela pointed out during her cross-examination of Michael that there

were occasions, coinciding with when she alleged break-ins occurred, that there were no transactions in Michael's banking records.

¶ 20 Michael clarified the circumstances surrounding his statement to Angela that he did not want to know her address. He testified that Angela contacted him after they had not spoken for a year, wanting him to come to her son's birthday party. Michael said he wanted to send a gift, and Angela offered to give him her address. However, Michael was "still very skeptical" of whether Angela was going to "pull the rug back out from underneath" him and not allow him to speak with her son again. Thus, he wanted to tread "very lightly," which is why he told her he did not need her address and preferred to mail the gift to Deborah.

¶ 21 Anthony testified that Michael has lived with him and his family in Virginia since August 2023. Aside from one trip to Ohio for Christmas in 2023, Michael has slept at Anthony's home every night since moving to Virginia. Anthony attested that Michael was "terrible" with technology. Additionally, due to Michael's financial struggles, Anthony supported him over the last year and a half by providing money for food and gas. Anthony managed Michael's income by doling out money to him. Anthony testified that Michael had not been to Illinois while living with him.

¶ 22 Before closing arguments, the trial court said that it deemed Deborah's testimony "particularly persuasive." The court believed that something "very serious" was happening to Angela, which was "one of the most serious types of invasions of space" the court had seen. The court also credited Anthony's testimony and believed that Michael "wasn't there" on several occasions when incidents occurred. However, the court stated, "Just because he isn't there doesn't mean he might not have something to do with it." Accordingly, the court requested the parties to focus their arguments on why Michael did or did not have a role in this harassment.

¶ 23 In her closing argument, Angela said that Anthony was like a brother to her, and she believed his testimony. However, Angela expressed her belief that either Michael was paying someone to have her harassed or that Melissa Black was doing it. She expressed her belief that Michael participated in harassing her up until he moved from Nevada to Virginia.

¶ 24 Michael's counsel responded that Angela had not met her burden to prove that Michael was responsible for the events she described. Counsel emphasized that Angela's testimony was based solely on her belief, whereas Michael introduced documentation showing his whereabouts on many dates. Among the other points counsel mentioned were that (1) it would be impractical for Michael to travel across the country in a day without there being a "digital record," (2) Michael lacked the technological knowledge to commit some of the acts that Angela described, (3) Michael denied knowing Melissa Black, and (4) Michael lacked the financial means to pay someone to harass Angela.

¶ 25 In her rebuttal closing argument, Angela mentioned that the harassment she was experiencing consisted of "the exact same things" that Michael "pretended were not happening" when she lived in Nevada. Angela could think of nobody else who might be responsible for the harassment in two states. Additionally, some events seemed "so personal" to Angela, such as her wedding earrings being destroyed. Angela felt that the reason for the harassment was that Michael was angry at her and punishing her over what happened with her son.

¶ 26 After the parties presented their arguments, the trial court took the matter under advisement. The court reiterated that this was "a very serious case." The court said that Deborah's testimony about feeling wet paint on the railing at Angela's house gave the court "reason to believe all the other stuff" was happening.

¶ 27 On July 29, 2024, the trial court entered a plenary order of protection against

Michael, with Angela and her son as the protected parties. Among the requirements of the order were for Michael to (1) stay away from Angela, (2) refrain from engaging in specified abusive acts (harassment, physical abuse, stalking, or interfering with personal liberty), and (3) avoid direct or indirect contact with Angela. The order will expire on November 3, 2025. Although the form order made the statutorily required findings, it contained little reasoning connected to the facts of the case. The only insight into the court's reasons for issuing the order of protection was a handwritten finding that "[Michael] was not present during some or all of the acts, but based on circumstantial evidence [Michael] played a role in said acts."

¶ 28    On August 28, 2024, Michael filed a notice of appeal from the orders entered on November 3, 2023, and July 29, 2024.

¶ 29                    II. ANALYSIS

¶ 30    On appeal, Michael argues that the judgment entering the plenary order of protection on July 29, 2024, was against the manifest weight of the evidence. He maintains that (1) Angela's testimony about being the victim of abuse was unsupported by photographs, camera footage, or documentation and (2) her theory about his involvement in the alleged abuse was speculative and contradicted by the documentary evidence he submitted. According to Michael, Angela relied on "fabricated and out-of-this-world fantasies to make her claim." Thus, he argues that the statutory factors a court must consider in determining whether to grant remedies in an order of protection weighed against Angela. See 750 ILCS 60/214(c)(1)(i) (West 2022) (directing the court to consider both (1) "the nature, frequency, severity, pattern and consequences of the respondent's past abuse *** of the petitioner" and (2) "the likelihood of danger of future abuse, neglect, or exploitation to petitioner"). As part of Michael's argument, he contends that the trial court failed to consider these factors, instead taking a " 'check-the-box approach' " in its form

order without making express findings regarding the parties' credibility or explaining which circumstantial evidence it deemed significant. As his relief, Michael requests that we reverse and vacate the judgment.

¶ 31    Angela represents herself on appeal. She maintains that the trial court correctly granted her an order of protection. She insists that she possesses photographs supporting her claim, though she was not allowed to introduce them at the evidentiary hearing due to Michael's objection. She also asserts that Michael was unable to document his whereabouts "on or directly around more than half of the dates" that the alleged events occurred. She further maintains that the dates she alleged in her petition may not have been exact, as someone stole the notebooks in which she documented the occurrences.

¶ 32    The Illinois Domestic Violence Act of 1986 (Act) (750 ILCS 60/101 *et seq.* (West 2022)) governs these proceedings. Relevant here, one of the requirements for the trial court to issue a plenary order of protection is for the court to find that the "petitioner has been abused by a family or household member." 750 ILCS 60/214(a) (West 2022). Michael and Angela are "family or household members" for purposes of the Act, as that term includes "former spouses." 750 ILCS 60/103(6) (West 2022). The Act's definition of "abuse" includes "harassment." 750 ILCS 60/103(1) (West 2022). In turn, "harassment" is defined broadly as "knowing conduct which is not necessary to accomplish a purpose that is reasonable under the circumstances; would cause a reasonable person emotional distress; and does cause emotional distress to the petitioner." 750 ILCS 60/103(7) (West 2022). Thus, " '[h]arassment does not necessarily require an overt act of violence.' " *Frank v. Hawkins*, 383 Ill. App. 3d 799, 815 (2008) (quoting *People v. Whitfield*, 147 Ill. App. 3d 675, 679 (1986)).

¶ 33    Once a trial court finds that the petitioner has been abused by a family or household

member and that certain procedural requirements not at issue here are met, the court "shall issue" an order of protection prohibiting the abuse. 750 ILCS 60/214(a) (West 2022). Section 214(b) of the Act (750 ILCS 60/214(b) (West 2022)) authorizes the trial court to fashion appropriate remedies. This allows the court "to tailor an order of protection to address individual circumstances and needs, improve victim safety and hold the perpetrator accountable for his or her actions." *Sanchez v. Torres*, 2016 IL App (1st) 151189, ¶ 22. In determining which remedies to grant, the court "shall consider relevant factors, including but not limited to" (1) "the nature, frequency, severity, pattern and consequences of the respondent's past abuse *** of the petitioner" and (2) "the likelihood of danger of future abuse *** to petitioner." 750 ILCS 60/214(c)(1)(i) (West 2022) In "an official record or in writing," the court must make findings and set forth, at a minimum, that it considered the applicable relevant factors. 750 ILCS 60/214(c)(3)(i) (West 2022). Such official record or writing must also indicate (1) whether the respondent's actions, "unless prohibited, will likely cause irreparable harm or continued abuse" and (2) whether the requested relief is necessary to protect the petitioner or others. 750 ILCS 60/214(c)(3)(ii)-(iii) (West 2022).

¶ 34        The petitioner must demonstrate his or her right to relief under the Act by a preponderance of the evidence. 750 ILCS 60/205(a) (West 2022). We apply the manifest-weight-of-the-evidence standard when reviewing the trial court's findings of abuse. *Best v. Best*, 223 Ill. 2d 342, 350 (2006). "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Best*, 223 Ill. 2d at 350. In conducting our review, we defer to the trial court, which was in "the best position to observe the conduct and demeanor of the parties and witnesses." *Best*, 223 Ill. 2d at 350. We may not substitute our judgment for the trial court's with respect to evaluating credibility, weighing evidence, or drawing inferences. *Best*, 223 Ill. 2d at 350-51.

¶ 35　　　　At the outset, we address some of Michael's assertions that are sprinkled within his challenge to the sufficiency of the evidence. Michael states that, from his position, "the trial court did not consider the factors outlined" in section 214(c)(1)(i) of the Act (750 ILCS 60/214(c)(1)(i) (West 2022)). Although not cited by Michael, we found authority holding that an order of protection must be reversed and vacated if there is no official record or writing setting forth that the court considered these statutory factors. *Landmann v. Landmann*, 2019 IL App (5th) 180137, ¶¶ 17-19. However, unlike in *Landmann*, the written form order here included language stating that the court considered the factors. We further note that these factors pertain to the remedies imposed once a court determines that a petitioner has been abused. On appeal, Michael challenges whether Angela proved her allegations of abuse, not whether any specific remedy was appropriate to address the abuse. For these reasons, Michael's assertion that the court failed to consider the statutory factors is not a basis for reversing the judgment.

¶ 36　　　　Michael also asserts that the trial court "did not acknowledge the credibility (of either party) in its decision" and failed to specify which circumstantial evidence was important to its decision. We recognize that the court's factual findings were extremely sparse, especially considering the extent and nature of the evidence presented. The court used a written form order that included the statutorily required findings. But the only language in the order providing insight as to the court's reasoning was a handwritten notation that although Michael "was not present during some or all of the acts," the circumstantial evidence showed he "played a role in said acts." As Michael notes, the court did not identify which circumstantial evidence led the court to this conclusion. The court also did not make express credibility determinations regarding either Michael's or Angela's testimony.

¶ 37　　　　Nevertheless, the trial court's oral comments provide additional insight into the

court's reasoning and facilitate our review. The court stated that it credited Deborah's testimony, which the record shows corroborated Angela's testimony about her property being damaged. The court also said that Deborah's testimony about feeling fresh paint on Angela's stairwell gave the court "reason to believe all the other stuff that's happening is happening." We take this to mean that the court credited Angela's testimony about the many unusual occurrences she detailed in her testimony. The court further credited Anthony's testimony that Michael had not been to Illinois since moving to Virginia in August 2023. Thus, it is apparent that the court believed Michael was responsible for or involved with the harassment, even though he did not personally commit all the acts that Angela described. To be sure, it would have been much more helpful to the parties and this court to have the benefit of more comprehensive findings of fact and credibility determinations. However, Michael does not claim that this is an impediment to our review, nor does he request a remand for further factfinding.

¶ 38        Thus, the question for our consideration is whether it was against the manifest weight of the evidence for the trial court to conclude that Angela experienced abuse and that Michael played a role in it. We hold that it was not.

¶ 39        The record supports the conclusion that Angela was the victim of abuse in the form of harassment. Again, "harassment" is defined as "knowing conduct which is not necessary to accomplish a purpose that is reasonable under the circumstances; would cause a reasonable person emotional distress; and does cause emotional distress to the petitioner." 750 ILCS 60/103(7) (West 2022). Among Angela's allegations were that somebody repeatedly broke into her car and home and vandalized her belongings. There is no question that Angela's testimony, if believed, outlined a pattern of harassment for purposes of the Act. Angela described many occurrences that even she recognized were extremely bizarre. However, contrary to Michael's contention, the record does

not compel the conclusion that Angela's testimony was "fabricated." As the trial court emphasized, Deborah corroborated some of Angela's allegations and personally observed damage to Angela's car and two different residences. On one occasion, Deborah returned to Angela's home and felt fresh paint on a stairwell, which strongly suggests that someone vandalized the home while Deborah and Angela were away. The court reasonably credited Deborah's testimony and, by extension, Angela's testimony, in concluding that Angela was the victim of harassment. We reiterate that we may not substitute our judgment regarding issues of witness credibility. *Best*, 223 Ill. 2d at 350-51.

¶ 40        The much closer question is whether the evidence supported the trial court's finding that Michael played a role in the harassment. For the following reasons, we hold that there was sufficient evidence to allow the court to make this finding.

¶ 41        The record lends itself to the conclusion that Michael personally perpetrated the harassment that Angela experienced when she lived in Nevada. This is a relevant consideration in determining whether an order of protection is warranted. See *A.A. v. Nita A.*, 2023 IL App (1st) 230011, ¶¶ 30, 44 (noting that the trial court may consider evidence of past abuse perpetrated in another state). Notably, the circumstances and timing surrounding the harassment in Nevada pointed to Michael. At Angela's request, Michael moved out of their shared residence on September 20, 2021. Angela started noticing unusual occurrences the next day. Neither Angela nor Deborah could think of anyone other than Michael who had a motive to harass Angela. The evidence also showed that Michael denied that unusual occurrences were happening in the months after the breakup, and he attributed Angela's complaints about such occurrences to a sudden onset of mental illness. But Deborah did not discern signs of mental illness when Angela moved to Illinois in early 2022. Thus, a reasonable conclusion from the evidence is that Michael fueled

suspicions that Angela was mentally ill when she was not. All these circumstances might reasonably lead one to believe that Michael personally perpetrated the harassment before Angela moved to Illinois.

¶ 42      We recognize that Michael lived and worked in either Nevada or Virginia after Angela moved to Illinois. We also understand that Michael provided documentation showing he was far from Illinois on many of the dates mentioned in Angela's petition. Nevertheless, the trial court was entitled to consider the totality of the circumstances in reaching its conclusion that Michael played a role in the harassment that Angela experienced. The harassment in Illinois was very similar, and sometimes identical, to the previous harassment. For example, somebody used the same paint to damage Angela's home and belongings in both Nevada and Illinois. If Michael did these things to Angela in Nevada, it is implausible that it would start again when she moved to Illinois without him being involved. Angela also testified that she experienced harassment more sporadically when she relocated to Illinois, which arguably supports a conclusion that the person responsible for the harassment did not live nearby. Furthermore, the harassment was targeted and very personal in nature. Angela testified that her belongings, not her son's, were damaged. She also found that the only jewelry destroyed was a pair of earrings Michael gave her on their wedding day. Angela testified that the harassment temporarily stopped when Michael attended a rehabilitation program. All these circumstances reasonably support the court's conclusion that Michael played a role in harassing Angela, even if he was not personally present for each incident. We note that at least some of the alleged harassment, such as digitally editing Angela's photographs, would not necessarily require the perpetrator to be near Angela.

¶ 43      Aside from the circumstantial evidence pointing toward Michael's involvement in the harassment, there was direct evidence that Michael was in Illinois and following Angela on

one occasion when he claimed not to be. Although Michael said that he had not been in Illinois since 2009 or 2010, Angela testified that she observed Michael following her car in either March or April 2022. She insisted that she was not mistaken. The trial court reasonably could have resolved this conflicting testimony in favor of Angela. The court was not required to believe that Angela confused a stranger for her ex-husband, nor does the record compel the conclusion that she was simply making this up.

¶ 44       To be sure, portions of Angela's testimony were based on pure speculation, such as her belief that Melissa Black was somehow involved. However, even ignoring this speculation, the record reasonably justifies the order of protection. Ultimately, the question is not whether this court believes that Michael played a role in harassing Angela. See *A.A.*, 2023 IL App (1st) 230011, ¶ 47 (explaining that the appellate court will not overturn an order of protection merely because that court "might have reached a different conclusion about what the evidence established"). Rather, the question is whether the trial court reasonably reached that conclusion from the evidence presented. Based on a close review of the record, the court's conclusion was reasonable. Accordingly, the judgment entering the plenary order of protection was not against the manifest weight of the evidence.

¶ 45                                    III. CONCLUSION

¶ 46       For the reasons stated, we affirm the trial court's judgment.

¶ 47       Affirmed.