2025 IL App (1st) 241923

SECOND DIVISION
June 17, 2025

No. 1-24-1923

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | |
| | ) | Appeal from the |
| PAUL KRILEY, | ) | Circuit Court of |
|     Petitioner-Appellee, | ) | Cook County |
| | ) | |
|     and | ) | 20 D 7036, |
| | ) | 20 OP 20476 |
| | ) | |
| ALENA KRILEY, | ) | Honorable |
|     Respondent-Appellant. | ) | Maritza Martinez, |
| | ) | Judge Presiding |
| | ) | |

_____

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Presiding Justice Van Tine and Justice McBride concurred in the judgment and opinion.

## OPINION

¶ 1    The parties here, Alena Kriley and Paul Kriley, married in January 2016. A little more than three years later, in 2019, their son, J.K., was born. Since then, little seems to have gone well. In October 2020, Paul filed a petition seeking an order of protection for him and his son against Alena under the Illinois Domestic Violence Act of 1986 (750 ILCS 60/101 *et seq.* (West 2020)). He also filed a petition to dissolve the marriage. The cases proceeded through discovery and various wranglings over the next few years and were eventually consolidated.

¶ 2    On August 30, 2024, the circuit court held a seven-hour evidentiary hearing on Paul and J.K.'s petitions for a plenary order of protection. After hearing testimony from Paul, Alena,

various experts and professionals, and J.K.'s guardian *ad litem* (GAL), the court found in favor of Paul and J.K. and issued a plenary order of protection against Alena for two years.

¶ 3    Alena appeals, alleging several errors. First, she claims one of the experts, a doctor, failed to timely hand over her report, and thus the trial court should have barred her testimony. Second, she challenges the court's issuance of the plenary order of protection. And last, she makes various challenges to the terms and conditions of the order. We affirm in all respects but, in the best interests of J.K., remand for a rehearing on the appointment of the GAL as the visitation supervisor and on the allocation of fees for that supervision.

¶ 4                                  BACKGROUND

¶ 5    Alena, the respondent and appellant here, was born and raised in Belarus and immigrated to the United States in 2015. She met Paul shortly thereafter; they married in 2016. Alena became pregnant with J.K., who was born in 2019.

¶ 6    The marriage began to deteriorate not long thereafter. On October 2, 2020, Paul filed petitions for an emergency order of protection (EOP), a plenary order of protection (POP), and for a dissolution of the marriage. After a hearing, the court concluded that Paul had not presented enough evidence to grant him an EOP. Alena was served with notice of the petition for the POP on Oct. 7, 2020. She filed her own *pro se* petition for an EOP against Paul later that same day.

¶ 7    This triggered the years-long saga of legal proceedings that continue to this day. In an affidavit seeking the EOP, which was first granted, Alena alleged several instances where Paul purportedly abused her. That EOP was vacated about a month later, however, and the remaining petition seeking a POP and the divorce proceedings were consolidated.

¶ 8    On November 6, 2020, Paul filed several emergency motions. In short, he alleged that he had not seen J.K. for 37 days, despite various court orders granting him custody and visitation,

and alleged that it was not in J.K.'s best interest that Paul be denied parenting time. The court held a hearing that afternoon—where Alena's counsel, but not Alena, appeared—and (1) dismissed Alena's petition for a POP for want of prosecution; (2) vacated her EOP; and (3) ordered that J.K. be turned over to Paul "immediately."

¶ 9    But J.K. remained with Alena. Three days later, on November 9, 2020, Paul filed an emergency petition for a rule to show cause. He said that he had been unable to find J.K., despite the help of local law enforcement. Along with the petition for a rule to show cause, Paul filed a second petition for an EOP. Alena again did not attend the court hearing on the EOP but was represented by counsel. Her attorney told the court that she had been in contact with her client, that the child was well, but that Alena refused to disclose the child's location.

¶ 10    The court granted the petition for the EOP and found that (1) J.K. was at risk of being taken out of the country; (2) Alena was concealing J.K. from Paul and law enforcement; and (3) it was in J.K.'s best interests that he be returned to Paul. The court issued a body-attachment order against Alena.

¶ 11    Alena was not served and did not accept service of any of these orders for several months. But in December 2020, the Consul General of Belarus in New York City contacted Paul. The Consul General said that Alena and J.K. had come to the Belarusian consulate seeking help. Paul quickly drove to New York City and brought J.K. and Alena back to Chicago. When they returned, Alena again tried to take J.K. away from Paul. Paul then called the police, who arrested Alena (though she was not charged with a crime).

¶ 12    Now that Alena was back in Chicago, on February 21, 2021, the court found that she had been personally served with Paul's new EOP, and different counsel appeared on her behalf. Counsel asked for a continuance to prepare for a hearing on the POP, and the court ordered the

parties to cooperate with the GAL, Michael Lodermeier, who was conducting his own investigation.

¶ 13    Again, things did not go well. In June 2021, Paul filed an amended affidavit in support of the POP. He swore that Alena had been violating the court's orders by refusing to show up to court and concealing J.K. Paul said he worried that Alena would leave the country with J.K. and return to Belarus; he noted that an Oak Park police detective, who had been in contact with Alena, said that she told the detective that she had no intention of returning J.K. to Paul.

¶ 14    Paul's affidavit also detailed several harassing or disturbing incidents he attributed to Alena. For example, on one occasion, Paul returned home to find that his apartment locks had all been changed. After climbing through an open window to get inside, he found his apartment ransacked. Another time, Paul said he received word from a rideshare driver in Florida, who had spoken to Alena, that Alena stated how easy it would be to get Paul and his family killed. Eventually, Alena's visitations with J.K. were curtailed, and J.K. remained in Paul's custody for the duration of the case.

¶ 15    The case continued throughout 2021. In this time, Paul moved to have Alena evaluated by a mental health professional, pursuant to Illinois Supreme Court Rule 215 (eff. Jan. 1, 2018). The parties signed an agreed order, naming the examiner and the date and time of the examination, but the order was never signed or entered by the trial judge. In January 2022, and after several more months of delays, the parties received the Rule 215 evaluation from the doctor who examined Alena, Dr. Kerry Smith. The court ordered the parties to confer with each other and agree on the earliest available trial date. Still, the case languished, with multiple continuances while the parties continued discovery.

¶ 16    Finally, on August 22, 2024, the court held a hearing on Paul's petition for a POP. Seven

people testified at the hearing, which lasted about seven hours.

¶ 17     First, Paul testified. He described the generally tenuous nature of his and Alena's marriage, which included various incidents of violence and frequent arguments. He showed the court a video he had recorded in 2020, in which Alena can be seen battering him and grabbing his shirt, resulting in minor injuries.

¶ 18     Paul also detailed the trip to New York to retrieve J.K. and Alena. Paul testified that he received a court order in September 2020, allowing him to take possession of J.K. after the court entered an emergency order of protection against Alena and naming him and J.K. as the protected parties. Yet from September 29 to November 20 of that year, Paul did not see his son, nor was he able to discover the location of Alena and J.K.

¶ 19     Finally, on December 9, 2020, someone in the Consulate of Belarus in New York City called Paul's attorney, and the attorney looped Paul into a three-way call. Paul learned his son was in New York City, and he quickly went home, packed up his car, and drove overnight to New York City. Paul then drove to the New York Consulate of Belarus and met with the consul. Alena and J.K. were in the consulate, and Alena later told Paul that she had taken a yellow cab from Chicago to New York City with J.K.

¶ 20     While at the consulate, Alena and Paul spoke about what had happened. Paul testified that Alena told him that she believed that once she went to the consulate, it would nullify the court orders and then she could fly from the United States to Belarus. After discussing what to do next, Paul and Alena went to a hotel and stayed in the city. Eventually, they drove back to Chicago together. When they returned to the apartment where Paul was living, Alena got upset and began to rip down pictures on the wall. Paul called the police, who arrested Alena. But she came back the next morning and tried to get into the apartment, despite the order of protection

still pending against her.

¶ 21    Another time, in February 2021, Paul went outside his house to discover his car was gone. Later that month, the president of the company Paul works for received an e-mail from Alena. The e-mail, in so many words, made Paul feel upset, scared, and concerned about his job. Then, in March 2021, Alena sent a text message to Paul's family, telling them that if they continued to support him, she would go to their homes, find them, and ruin them. Paul said that Alena also would sometimes leave little notes on Paul's back balcony, evidence that she had been there when he was not.

¶ 22    A month later, in April, Paul came home to find he could not get into his apartment because his keys no longer worked. He was able to find a ladder and climb in through a window. Once inside, he found the apartment had been ransacked; many of his belongings were gone, as were some cash, artwork, computers, and Alena's remaining belongings.

¶ 23    Paul also testified about visitations between Alena and J.K. He said that, though Alena only was allowed to see J.K. virtually four times a week, her visits could be erratic. At times, she would accuse Paul of things in front of J.K., or bring other people into the sessions, forcing Paul to shut them down. Paul also said that Alena would encourage J.K. to misbehave, such as making a mess in the house.

¶ 24    Based on his experiences with Alena, Paul said he was scared she would show up randomly and try to take J.K. away, perhaps to Belarus as she had threatened before.

¶ 25    The court also heard from Dr. Kerry Smith, who evaluated Alena in 2021 as part of the discovery process in the case. Dr. Smith detailed Alena's significant mental health history, including serious post-traumatic stress she suffered after being sexually assaulted in Belarus. Dr. Smith observed that Alena had several obsessive-compulsive features, a history of depression

and anxiety, and, at times, some delusions and one incident of homicidal ideation. Over Alena's objection, the court allowed Dr. Smith's report to be entered into evidence.

¶ 26    Dr. Smith ultimately recommended that Alena undergo intensive mental health treatment and that, until she completed at least six months of treatment, she should not have contact with J.K. However, Dr. Smith admitted that she had not seen Alena in nearly three years, since the examination was in 2021, nor did she know if Alena had made any progress in her own treatment since then.

¶ 27    Next, Hope Estrada testified. Estrada was a nurse who worked as a rideshare driver for extra money. She recalled Alena as one of her passengers in March 2021, though Estrada could not identify Alena in the courtroom (she testified via video from Florida). While Estrada could not remember many of the particulars, like where she picked Alena up, Estrada said that Alena told her about the case and J.K., at one point saying that she could have someone killed. Estrada later called Michael Lodermeier, the GAL in the case, and played for him a 40-minute recording of Alena that Estrada had surreptitiously recorded. Estrada could not play the recording for the court at the hearing, however, because she could not find it.

¶ 28    Lodermeier took the stand and detailed his GAL investigation in the case. He said that, while he initially recommended that Alena have supervised parenting time with J.K., things quickly went sour. He had a conversation with Estrada after Estrada gave Alena a ride in Miami. Estrada told Lodermeier that Alena had asked her if she (Estrada) could find people to harm Paul and Paul's parents. Lodermeier then heard a recording that Estrada made in which a woman, whom Lodermeier believed was Alena, made threats against Paul and his family.

¶ 29    Lodermeier emphasized that he could not envision how Alena could have an appropriate relationship with J.K. without seeking help and that it would be unhealthy for J.K. to have

contact with his mother without that treatment. He believed there was a risk that Alena would abduct J.K. and try to flee, similar to when she took J.K. to New York. Additionally, Lodermeier said he believed that without treatment, Alena posed a danger to J.K., that the boy could get hurt if left in her care. Lodermeier recommended that her parenting time be completely suspended unless and until she went and received help for her underlying mental condition.

¶ 30    In her case, Alena presented testimony from two mental health professionals, Dr. Laura Patton and Michael Melaniphy. Dr. Patton told the court that she was Alena's psychologist and saw her for treatment between one and three times per month, depending on Alena's needs. Dr. Patton believed that Alena did not pose a threat to anyone, that she was a good mother, and that she was qualified to be alone with J.K.

¶ 31    Melaniphy, Alena's domestic violence counselor, testified that he had been meeting weekly with Alena for nearly four years. Melaniphy believed Alena was a survivor of domestic violence, but that she had been working through it with counseling.

¶ 32    Against her attorney's advice, Alena then testified. She explained the incident when she took J.K. to New York City, saying that she went to the Belorussian consulate because she believed it would help protect her rights in the litigation against her husband. She admitted that she felt overwhelmed and did not know how to handle the situation because she was not a native citizen and did not understand what was happening. Alena also said that Estrada, the rideshare driver, suggested that she could help Alena only after Alena told her about the case. After finding out what Estrada told Lodermeier—that Alena had threatened Paul—Alena called Estrada to ask her why she was speaking with Lodermeier, suggesting that Estrada was lying.

¶ 33    Alena also admitted she had been diagnosed with post-traumatic stress disorder because she had been sexually assaulted in Belarus. She testified that her counseling sessions were

helping her deal with her trauma.

¶ 34    After nearly seven hours of testimony, the parties made closing arguments. During Alena's closing, the court interjected several times to ask questions and draw counsel's attention to various pieces of evidence. The court noted that it had already made a judicial finding, on a previous court date, that Alena had told Estrada that she wanted Paul and his family members murdered and had given Estrada several phone numbers of those family members.

¶ 35    The court said that it would give Estrada's testimony very little weight—in no small part because Estrada was otherwise disrespectful and impolite while testifying—but that it believed Lodermeier's testimony that he heard a recording with Alena's voice making the purported threats. The court also noted that threatening to leave a child with a dead father and a jailed mother would be extremely harmful to J.K. The court also told counsel that the two professionals that Alena called to the stand, while helpful, were "not sufficient. They're not court experts."

¶ 36    After arguments, the court concluded that Alena had abused both J.K. and Paul and granted them a two-year plenary order of protection against her. The court ordered Alena to undergo another mental health evaluation before she could resume in-person parenting time with J.K., but did allow her three, 30-minute video visitation sessions with J.K. per week. But before the court would modify that order for parenting time, it would require Alena to get evaluated and "medication and/or treatment compliant."

¶ 37    Additionally, the court ordered Lodermeier to supervise each visit Alena had with J.K. Almost immediately, Lodermeier asked for clarification, apparently surprised by the court's decision to appoint him as visitation supervisor. He said that he had not been paid by either Paul or Alena for the duration of the case and questioned how Alena had a pauper's petition (declaring her indigent) granted when she had been able to retain three different attorneys to

work on her case. The court told Lodermeier it understood and added a condition that before the visitations could begin, the parties would have to bring Lodermeier's bill current, with the costs split equally between Paul and Alena.

¶ 38    Alena immediately objected, telling the court that she did not have any money to pay Lodermeier. The court reiterated that "if neither one of you pays the GAL, then we're not going to be able to have the visits." Alena again objected and offered to have the visits recorded, but the court adjourned the proceedings. The court later entered a written order of protection, laying out its findings and the terms in the order, including that the GAL be present at all visitations and that the parties would split his costs "50/50." Alena now appeals.

¶ 39                                         ANALYSIS

¶ 40    On appeal, Alena advances several attacks on the proceedings in the trial court. First, she alleges that Dr. Smith should have been barred from testifying because the doctor did not timely disclose her written report. Next, she believes the trial court failed to adequately state the grounds for its decision. Alena also challenges whether the evidence at the hearing was sufficient to prove that she abused Paul and J.K., as the Domestic Violence Act defines it. Finally, she objects to the court's decisions regarding her visitation with J.K.

¶ 41                              I. Supreme Court Rule 215

¶ 42    We begin with Dr. Smith and her report. Alena argues that that the doctor, who conducted a mental health examination of Alena as part of this case, violated Illinois Supreme Court Rule 215(c) (eff. Jan. 1, 2018) when she did not submit her written report of her examination within 21 days of completing it. Alena argues that Dr. Smith should not have been allowed to testify and, since the doctor's testimony was a cornerstone of Paul's case, asks us to reverse and remand for a new hearing on the POP.

¶ 43    Illinois Supreme Court Rule 215 (eff. Jan. 1, 2018) is a rule of discovery that allows the court, upon motion, to order a party to submit to a physical or mental examination if that person's physical or mental condition is "in controversy" in the case. See *Kallal v. Lyons*, 2021 IL App (4th) 200319, ¶ 18. The motion must identify the identity of the proposed examiner and set forth their specialty or discipline. Ill. S. Ct. R. 215(a) (eff. Jan. 1, 2018).

¶ 44    The court's order "shall fix the time, place, conditions, and scope of the examination and designate the examiner." *Id.* "Within 21 days after the completion of the examination, the examiner shall prepare and deliver to the attorneys for" the parties "a written report of the examination, setting out the examiner's findings, results of all tests made, and the examiner's diagnosis and conclusions." Ill. S. Ct. R. 215(c) (eff. Jan. 1, 2018). The rule permits the court to allow modifications to that 21-day deadline. *Id.*

¶ 45    Alena claims that Dr. Smith did not timely deliver her report to the parties as required under Rule 215(c), and thus her testimony should have been barred. We disagree for several reasons. The first one is insurmountable: the court never entered an order pursuant to Rule 215.

¶ 46    Paul moved, pursuant to Rule 215, to order Alena to submit for a mental examination. But as Paul notes in his brief (which Alena does not deny in her reply), the court never entered that order, and none appears in the record. To be sure, the parties prepared an "agreed order"— appointing Dr. Smith as the examiner and noting the time, place, conditions, and scope of the examination—but that order was never signed by the court, much less entered.

¶ 47    There is nothing wrong with parties agreeing in discovery to an examination. Trial courts are happy to see the parties cooperate on discovery issues without court intervention. But the court would not have authority to sanction a party for noncompliance with an informal agreement to conduct an independent medical examination, absent a court order in the first

instance.

¶ 48    There is a difference between Rule 215 and other discovery rules. Many supreme court rules—permitting such discovery as depositions, interrogatories, and production of documents—are self-executing in the sense that they do not first require a court order. See Ill. S. Ct. R. 212 (eff. Oct. 1, 2020); R. 213 (eff. Jan. 1, 2018); R. 214 (eff. July 1, 2018). A party may seek a court order to *compel compliance* with these rules, of course, or to seek relief from them via a protective order, but a court order is not required in the first instance.

¶ 49    In contrast, Rule 215 requires, upon motion and reasonable notice, that the court enter an "order *** to submit to a physical or mental examination," as the case may be. Ill. S. Ct. R. 215(a) (eff. Jan. 1, 2018). Here, the court did not enter such an order. So the court would have no grounds to sanction Paul (or Dr. Smith) for noncompliance. Or at the very least, we could never hold that the trial court abused its discretion for declining to impose a sanction for failure to comply with a nonexistent court order.

¶ 50    As the court never entered a Rule 215 order, Alena cannot complain about noncompliance with that rule.

¶ 51    Even if we considered the question further, Alena has not demonstrated that Dr. Smith violated Rule 215. The rule provides that "[w]ithin 21 days after the completion of the examination, the examiner shall prepare and deliver to the attorneys for the party requesting the examination and the party examined a written report of the examination ***." Ill. S. Ct. R. 215(c) (eff. Jan. 1, 2018). But it is not up to Alena, or even a judge, to decide when the doctor completed her examination.

¶ 52    Alena claims that Dr. Smith "admitted that she finished her examination in October 2021," but Dr. Smith's affidavit said no such thing. Dr. Smith chronicled that she tested Alena

(via an online portal) in June 2021, that she met with Alena three times in August and September, and that she met with Paul and reviewed documentation from Paul as late as October 26, 2021. "Thereafter," she stated, she reviewed and evaluated the results of the tests and then wrote her report, though she was delayed in that she was "out of the office for two weeks in October 2021 and two weeks in November 2021 for a conference and then for Thanksgiving."

¶ 53    The record does not reveal the precise date that Dr. Smith completed her examination, though logic would dictate it was in mid- to late December. Alena has not established a violation of Rule 215, even if Rule 215's dictates applied.

¶ 54    Alena's cited case does not assist her. In *Batson v. Township Village Associates, LP*, 2019 IL App (5th) 170403, ¶¶ 5-7, the expert sent his report to one side's attorney within 21 days but not to opposing counsel, who finally received it just before a critical deposition, for which the report would have relevance. There was no question as to the lapse of time between the expert's examination and the delivery of the report, as here.

¶ 55    Finally, as Paul also points out, the court continued the matter several times while the parties awaited Dr. Smith's report. The record contains several orders continuing this matter on this ground. Alena never objected on timeliness grounds at any time.

¶ 56    For all these reasons, we find no merit to Alena's claimed violation of Rule 215.

¶ 57    Turning her attention to the hearing on the plenary protective order and its conditions, Alena makes several challenges to the court's findings.

¶ 58                    II. Consideration of Relevant Factors

¶ 59    First, Alena complains that the circuit court did not state, in writing or orally, the relevant findings the Domestic Violence Act requires. Section 214 lays out the procedure and available remedies in an order of protection proceeding. 750 ILCS 60/214 (West 2020). Section 214(c)(3)

says that the court "shall make its findings in an official record or in writing, and shall at a minimum set forth the following: *** That the court has considered the applicable relevant factors described in paragraphs (1) and (2) of this subsection." *Id.* § 214(c)(3)(i).

¶ 60     The "relevant factors" the court must consider, at a minimum, are in section 214(c)(1):

"(i) the nature, frequency, severity, pattern and consequences of the respondent's past abuse, neglect or exploitation of the petitioner *** and the likelihood of danger of future abuse, neglect, or exploitation to petitioner or any members of petitioner's *** family or household; and

(ii) the danger that any minor child will be abused or neglected or improperly relocated from the jurisdiction, improperly concealed within the State or improperly separated from the child's primary caretaker." *Id.* § 214(c)(1)(i), (ii).

¶ 61     Here, the court made oral findings and filled out a written order, which consisted of a standardized, preprinted form. On that form, the court checked boxes, noting that there was reason to believe that Alena was dangerous and suicidal and that it had considered "all relevant factors," followed by a list that tracks the language of section 214(c)(1)(i) verbatim.

¶ 62     Alena contends that neither the oral findings nor the checked boxes on the preprinted form were sufficient to satisfy section 214(c)(3)'s minimum requirement. We disagree. Although the court's oral findings were a little sparce, its comments during the hearing, combined with the notes on the order, satisfy section 214(c)(3)'s mandate. When the court's statements comport with the minimum statutory requirements and the record supports the statutory required findings, we will not overturn an order because it lacks specificity. *In re Marriage of McCoy*, 253 Ill. App. 3d 958, 965 (1993).

¶ 63     While the court's remarks at the end were brief, it is evident from the record that the

court considered the appropriate factors in making its ruling. See *Mowen v. Holland*, 336 Ill. App. 3d 368, 376 (2003). During Alena's closing argument, the court made several comments that establish it was mindful of the relevant factors in section 214(c)(1). For example, the court told counsel that it gave great weight to the testimony of Lodermeier, the GAL, especially when he testified about the threats to Paul's family that Alena made to Estrada, the rideshare driver.

¶ 64    And the court highlighted that "one of the main reasons why we're here" is because Alena had "threatened grave bodily harm" on Paul, calling it "the most concerning thing." Then, the court took notice of a prior judicial finding that Alena had told Estrada that she wanted to murder Paul's family members.

¶ 65    The court bluntly noted that a child "who was left with a father in the grave, and a mother in jail" would be harmed irreparably. Undeniably, the "severity, pattern and consequences of respondent's past abuse" and the "likelihood of danger of future abuse" was at the forefront of the court's mind. 750 ILCS 60/214(c)(1)(i) (West 2020). The court was likewise concerned with "the danger that any minor child will be abused or neglected or improperly relocated from the jurisdiction." *Id.* § 214(c)(1)(ii). That finding was well-founded: Lodermeier testified that he was concerned Alena would abduct J.K. and leave for Belarus if "court didn't go well for her." And there was Paul's testimony about Alena absconding from Illinois with J.K. and appearing at the Belorussian consulate in New York City.

¶ 66    And if that were not enough, the court also filled out a written order that spoke to section 214(c)(3)(i). All in all, the court's findings satisfied section 214(c)(3)(i).

¶ 67                                    III. Finding of Abuse

¶ 68    Next, Alena challenges the court's finding that she abused Paul and J.K. In any proceeding to obtain an order of protection, the central inquiry is whether the petitioner has been

abused. *Best v. Best*, 223 Ill. 2d 342, 348 (2006); 750 ILCS 60/214(a) (West 2020). A person seeking an order of protection must establish, by a preponderance of the evidence, that the respondent has abused the petitioner or another party the petitioner is responsible for. *Best*, 223 Ill. 2d at 348. "Abuse" encompasses "physical abuse, harassment, intimidation of a dependent, interference with personal liberty or willful deprivation." 750 ILCS 60/103(1) (West 2020).

¶ 69    When a trial court makes findings of abuse after hearing evidence and testimony, we will reverse that decision only if the court's findings are against the manifest weight of the evidence. *In re Marriage of Doe*, 2024 IL App (1st) 230935, ¶ 34. A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding is not based on the evidence presented. *Id.* We defer to the trial court as the factfinder, as it is in the best position to observe the conduct and demeanor of the parties and witnesses. *Best*, 223 Ill. 2d at 350-51.

¶ 70    The parties, as spouses and the minor child of that marriage, are clearly family or household members, making the Domestic Violence Act applicable. 750 ILCS 60/103(6) (West 2020). Alena's only claim is that her acts did not constitute abuse. But the evidence amply supports the court's conclusion. Paul testified to various incidents that constituted harassment, and the record clearly shows that Alena concealed J.K. from Paul and improperly removed J.K. from the jurisdiction when she took him to New York City—acts also defined as "harassment" under the Domestic Violence Act. *Id.* § 103(7)(v).

¶ 71    For example, Paul testified that Alena sent an inappropriate e-mail to his employers, which understandably upset him and created a disturbance on his job. Creating a disturbance at petitioner's place of employment is harassment. *Id.* § 103(7)(i). At one point, in March 2021, Alena sent a text message to Paul, his parents, and his siblings, saying that if they continued to support him, she would go to their homes and "ruin" them. This, too, was harassing behavior.

See *A.A. v. Nita A.*, 2023 IL App (1st) 230011, ¶ 48 (sending unwanted text messages constitutes abuse).

¶ 72    A few weeks later, Paul went to his apartment to find that his keys did not work on any of the doors or locks, and he had to use a ladder to get in through an open window. Once inside, he described the apartment as "ransacked." Sometimes, Paul would find notes Alena left for him on his back balcony, proving that she had been there without his permission or knowledge. All of this, despite the fact that, for much of the time this case was pending, there was an emergency order of protection in place forbidding Alena from contacting Paul. These acts were all abusive under the Domestic Violence Act. 750 ILCS 60/103(1), (7)(ii), 7(iv) (West 2020).

¶ 73    Alena claims that the evidence of abuse from three years ago was stale and somehow less relevant. But instances of abuse from prior years do not have less evidentiary weight simply because of the passage of time. *Richardson v. Booker*, 2022 IL App (1st) 211055, ¶ 56. The purpose of the Domestic Violence Act is to protect victims of domestic violence from *further* acts of physical, emotional, and verbal abuse. *Dibenedetto v. Dibenedetto*, 2019 IL App (3d) 180761, ¶ 15.

¶ 74    The court must consider "the nature, frequency, severity, pattern and consequences of the respondent's *past* abuse," no matter how remote in time it may be. (Emphasis added.) 750 ILCS 60/214(c)(1)(i) (West 2020); see *A.A.*, 2023 IL App (1st) 230011, ¶ 44. Any past evidence of abuse, no matter how remote, may be relevant to prove why the petitioner deserves the Domestic Violence Act's protection. See *Dibenedetto*, 2019 IL App (3d) 180761, ¶¶ 6-10 (details of abuse over entirety of 45-year marriage relevant to whether petitioner was abused); *Richardson*, 2022 IL App (1st) 211055, ¶ 59 (evidence of abuse is relevant, "whether it occurred 40 years ago or 5 years ago").

¶ 75 And Alena's argument that evidence of her abuse is stale and irrelevant also cuts against her. For most of this case, an EOP has been in place protecting Paul and J.K. As Alena points out, the evidence at the hearing suggests that she has not committed any abusive acts in nearly three years—the same time the EOP has been in effect. It very well could be that the EOP worked exactly as intended: to prevent Alena from abusing Paul and J.K. The plenary order of protection is simply a more permanent version of a fix that was already working.

¶ 76 Alena also claims that Paul is misusing the order of protection to settle divorce issues. Those fears are misplaced. As Alena herself notes, the purpose of the Domestic Violence Act is to aid victims of domestic violence and to prevent further abuse, not to resolve issues of visitation and custody. *Wilson v. Jackson*, 312 Ill. App. 3d 1156, 1165-66 (2000). The marital dissolution case was consolidated with this order-of-protection proceeding. While there is certainly some overlap of issues between the proceedings, the circuit court obviously found Paul's position valid and, thus, not a misuse of an order of protection to enhance his position in the marital-dissolution proceeding.

¶ 77 In sum, the record amply supports the trial court's finding that Alena abused Paul and J.K., as the Domestic Violence Act defines it, and that finding was not against the manifest weight of the evidence.

¶ 78                                IV. Parenting Time

¶ 79 Alena challenges the court's decision regarding parenting time. Though the court entered a two-year POP for Paul and J.K. against Alena, the court permitted Alena three virtual, supervised visitation sessions per week with her son, with each session lasting 30 minutes, and the supervisor being the GAL, Lodermeier. This was a reduction in parenting time from the EOP, which allowed her to virtually visit with J.K. five days per week (we assume those previous

visits were unsupervised).

¶ 80    Alena raises two distinct arguments. First, she says the court failed to make adequate findings to justify the reduction in her parenting time. Second, she claims that requiring supervised visitation and requiring her to pay half the fee for the supervisor punished her, in that she cannot afford the fees. We take those arguments in turn.

¶ 81                              A. Reduction in Parenting Time

¶ 82    The Domestic Violence Act vests the circuit court with broad discretion in determining the parenting time, if any, to which a respondent to a petition for an order of protection is entitled. 750 ILCS 60/214(b)(7) (West 2020). And here, on the written order, the court found that Alena was likely to abuse or endanger J.K. during parenting time, use that time to harass the child or Paul, improperly hide or detain J.K., or otherwise act in a way that was not in his best interest. The evidence at the hearing supported each of these findings. Again, the court's findings were more than adequate.

¶ 83    Contrary to Alena's claims, the circuit court here crafted a well-balanced compromise, considering the facts of this case. During the hearing, Lodermeier, the GAL, testified that he did not think Alena should have *any* parenting time at all and that any interaction between her and J.K. was not in J.K.'s best interests because she had not received help to deal with her mental health issues. The court, in making its findings, specifically noted Lodermeier's suggestion and disagreed with it. Instead, it granted Alena limited, supervised time, with an option to expand it should she undergo treatment to deal with her struggles.

¶ 84    The court's conclusion here was more than reasonable and more than adequately explained. The court here did not bar Alena from any contact with her son; it attempted to balance her rights as a mother with the need to protect J.K. See *id.*; *cf. Peck v. Otten*, 329 Ill.

App. 3d 266, 269-70 (2002) (POP that barred father from having any contact with son was unreasonable), *overruled on other grounds by Best*, 223 Ill. 2d 342. We find no error in the reduction of parenting time.

¶ 85                                    B. Supervision of Parenting Time

¶ 86     The second issue, concerning the appointment of the supervisor for the virtual visitations, presents more of a challenge. Though the court did grant Alena parenting time with J.K, it required that Lodermeier, the GAL, supervise those sessions. This surprised Lodermeier, a licensed attorney, who pointed out that he would charge for the supervision and that he had not been paid yet for his services in the case (presumably referring to the marital-dissolution case).

¶ 87     The court then ruled that Alena's supervised visitation could not begin until Lodermeier's fees were paid, with the parties splitting the cost evenly. Alena, on her own (though represented by counsel), immediately objected, saying she did not have any money to pay Lodermeier. Nevertheless, the court included this condition in its written POP.

¶ 88     Alena argues that this supervision fee is unreasonable and against public policy because it conditions her ability to visit J.K. on the payment of Lodermeier's fees. She also fears that, since Lodermeier is under no obligation to supervise the visits unless his fees are paid and current, Paul could choose not to pay his half and prevent her from seeing J.K. We review the court's visitation decision for an abuse of discretion. *In re Marriage of Betsy M.*, 2015 IL App (1st) 151358, ¶ 59; *In re Marriage of Patel*, 2013 IL App (1st) 112571, ¶ 158.

¶ 89     We should be clear at the outset that we find no abuse of discretion in the court's determination that Alena's virtual visits with J.K. should be supervised. That decision was well-supported by the record of Alena's behavior, as discussed at length above. Indeed, as noted, the GAL recommended no visits whatsoever; the court's decision to allow them, albeit virtually and

under supervision, reflected a compassionate middle ground.

¶ 90    Still, the choice of the GAL to supervise visitation was unusual. And from what we can discern from the record, nobody was particularly enthused with the idea—not the circuit judge, not the GAL, and not Alena.

¶ 91    The GAL is an attorney whose duties include taking whatever steps necessary to fully investigate the matter involving the child and issuing a written report to the court with recommendations in the child's best interests. See 750 ILCS 5/506(a)(2) (West 2020); Ill. S. Ct. R. 907(d) (eff. Mar. 8, 2016). The GAL, simply put, is the "eyes and ears of the court." (Internal quotation marks omitted.) *Nichols v. Fahrenkamp*, 2019 IL 123990, ¶ 46.

¶ 92    The GAL's task, to be sure, involves interacting with the parent and child, among many other things. See Ill. S. Ct. R. 907(d) (eff. Mar. 8, 2016). It might well include, in the GAL's discretion, observing the occasional supervised parental visit. But the job of overseeing (and perhaps refereeing) the conduct of a parent during visitation—and doing so three times a week for up to two years—feels like an odd extension of that role, particularly when other professionals specialize in that area. See, *e.g.*, *In re Marriage of Palarz*, 2022 IL App (1st) 210618, ¶ 12 (GAL recommended appointment of new visitation supervisor); *Marriage of Patel*, 2013 IL App (1st) 112571, ¶ 160 (trial court ordered supervision by "professional visitation supervisor"); *Marriage of Betsy M.*, 2015 IL App (1st) 151358, ¶ 19 (parents used "visitation supervisor").

¶ 93    The circuit judge well understood the preference for a professional supervisor. The parties had long discussed the idea that Alena might be afforded in-person (as opposed to virtual) parenting time but that it would be supervised, most likely by a professional visitation supervisor. As early as February 2021, the GAL told the court he was "open to" the possibility of

supervised in-person visitation, if he could find "the appropriate facility" to supervise the visitation. "The last couple of people we talked to," said the GAL, "wouldn't do it."

¶ 94    The court reiterated this sentiment over two years later, at the outset of the hearing at issue here. The court explained that, "[a]s of right now, there is no supervisor that will take the risk—no legitimate trained, insured supervisor who will take the risk right now to supervise parenting time with you and your child."

¶ 95    We can only discern from these comments that the reason that professional supervisors were declining was the fear of placing supervisors physically in harm's way during in-person visitations, given Alena's behavior over the years. But what about supervised *virtual* representation, as the court ultimately ordered here?

¶ 96    It is not clear to us why the court did not consider professional visitation supervisors for the virtual parenting time it ordered. Maybe it did, and we missed it between the lines; maybe the supervisors were unwilling to get involved in this matter even virtually. But that is not clear to us. Nor, for that matter, do we, as appellate judges, know whether professional supervisors might be less expensive than the GAL, an attorney, which might address some of Alena's financial concerns.

¶ 97    We do know that the circuit judge rejected the GAL's recommendation to cut off all contact between Alena and J.K., indicating her interest in maintaining the parent-child relationship as much as possible. And though (as the GAL and Paul were quick to point out) Alena did not substantiate her claim of inability to pay, this matter also arose at the end of a marathon seven-hour hearing that was quite contentious. And as noted above, the GAL would not normally be the optimal choice to supervise parenting time on a weekly basis.

¶ 98    Out of an abundance of caution, we think it is in the best interests of J.K. that the court

take another pass at the question of supervised visitation. Alena should be prepared to substantiate her claimed inability to pay. *Cf. Marriage of Patel*, 2013 IL App (1st) 112571, ¶ 160 (mother's claim that she could not afford visitation supervisor's fee rejected, in part, because mother "failed to provide documentation or credible testimony to support her claimed expenses"). Paul, of course, will validly point out, as he does before us, that Alena's conduct is the only reason supervision is needed, so it would be unfair if too much of the financial burden were placed on him.

¶ 99     We should be clear: we are *not* ordering the court to reach a different result. Odd as the choice may be, the court may ultimately fall back on its original decision to appoint the GAL as the visitation supervisor, given his knowledge of the case and the players. But maybe there is a less expensive alternative. Or maybe (dare we say) the parties could agree on a supervisor subject to the court's approval.

¶ 100   We thus vacate the court's order on this limited ground and remand for a rehearing on the question of supervised visitation and allocation of fees.

¶ 101                              V. Assignment of New Judge

¶ 102   Finally, Alena asks us to assign this case to a new judge on remand, complaining of the long delay the case took to come to a hearing and alleging that the court failed to comply with Illinois Supreme Court Rule 922 (eff. Mar. 8, 2016). We decline that request because neither the marital-dissolution case generally nor Rule 922 specifically are before us on appeal.

¶ 103   In pertinent part, Rule 922 provides that "All allocation of parental responsibilities proceedings under this rule in the trial court shall be resolved within 18 months from the date of service of the petition or complaint to final order." *Id.* But an action for an order of protection under the Domestic Violence Act is not a proceeding for "allocation of parental responsibilities."

¶ 104    As the committee comment notes, those actions occur in "dissolution of marriage and paternity cases." Ill. S. Ct. R. 922, Committee Comments (rev. Mar. 8, 2016). Indeed, Rule 922 is in part B of article IX of the supreme court rules, which says "Part B shall apply to allocation of parental responsibilities proceedings filed under the Illinois Marriage and Dissolution of Marriage Act, and the Illinois Parentage Act of 1984." Ill. S. Ct. R. 921 (eff. Mar. 8, 2016).

¶ 105    So while a Domestic Violence Act proceeding may, in the appropriate case (as here), include questions of parenting time, that does not convert the entire proceeding into one that falls under Rule 922.

¶ 106    Rule 922 aside, we would not assign a new judge, as the delay attributed to the case rests largely on Alena's shoulders, for the reasons we have chronicled above. We agree with the trial court, which referred to Alena's "dilatory tactics" throughout the case. In our view, the court has handled a difficult case admirably. We deny this request.

¶ 107                                VI. Award of Fees

¶ 108    In the conclusion of his brief, Paul asks that he be awarded fees under Illinois Supreme Court Rule 375(b) (eff. Feb. 1, 1994) for having to defend a "frivolous" appeal. While Alena's arguments did not persuade us, they did not rise to the level of frivolous. We deny this request.

¶ 109                                CONCUSION

¶ 110    The judgment of the circuit court is affirmed in all respects, save one. The judgment is vacated insofar as the court ordered supervised virtual visitation. The cause is remanded for further proceedings and, in particular, for a rehearing on the question of who should be appointed as visitation supervisor and how fees should be allocated.

¶ 111    Affirmed in part, vacated in part, and remanded.

*In re Marriage of Kriley*, 2025 IL App (1st) 241923

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, Nos. 20-D-7036, 20-OP-20476; the Hon. Maritza Martinez, Judge, presiding. |
| **Attorneys for Appellant:** | Michael G. DiDomenico, Sean M. Hamann, and Lillian M. O'Neill, of Lake Toback DiDomenico, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Brian J. Hurst and Priyal Thakkar, of Hurst, Robin, Kay & Allen, LLC, of Chicago, for appellee. |